[No. 27900.   Department Two.   August 6, 1941.]

MARYLAND CASUALTY COMPANY, *Plaintiff*, v. THE CITY
OF SEATTLE, *Respondent and Cross-Appellant,*
FELIX ARCORACE et al., *Appellants.*[1]

[1]Reported in 116 P. (2d) 280.

*Wright & Wright, Kerr, McCord & Carey,* and *Edwin C. Ewing,* for appellants.

*A. C. Van Soelen, J. Ambler Newton,* and *C. V. Hoard,* for respondent and cross-appellant.

DRIVER, J.—Felix Arcorace and Joe Coluccio, contractors, completed some sewer construction work for the city of Seattle, and the surety on their bond brought this action to obtain an adjudication of the claims against the retained percentage of their pay. The contractors and their assignee, The National Bank of Commerce of Seattle, cross-complained against the city for additional compensation. The city, by its answer, denied further liability and asserted a counterclaim against the contractors for water, electric power, inspection, and other charges. By stipulation of the parties, the controversy between them on the issues thus framed was separated, for the purpose of trial, from other claims and controversies in the case. After a trial to the court, the contractors were awarded recovery on four of the eight items of the cross-complaint, the city was granted a partial offset on its counterclaim, and findings and judgment were entered accordingly. The contractors and the bank appealed because of the rejection of their principal claim, based upon the added cost of the construction of a portion of the tunnel section of the project by the use of compressed air. The city cross-appealed as to three of the four

items on which judgment was entered in favor of the contractors.

We shall not vary the designation of the parties on account of the cross-appeal. For convenience throughout the rest of this opinion, the contractors will be called the appellants and the city of Seattle the respondent.

The pertinent facts on the original appeal may be summarized as follows:

November 26, 1935, in furtherance of a comprehensive plan to divert sewage from Lake Washington to a salt water outlet through the Duwamish waterway, the respondent published a call for bids, to be submitted on December 11th, for the construction of Henderson street trunk sewer, units Nos. 3, 4, 6, and 7. The appellants examined the plans and specifications prepared by the respondent, as well as the site of the work, and submitted a bid. It was accepted, the contract was signed, and, on January 6, 1936, the city engineer notified the appellants to start operations.

The appeal involves only unit No. 4, which consisted of the construction of a sixty-inch monolithic concrete sewer in a tunnel on Empire way, from Merton way north to a point a short distance south of Henderson street, and a forty-eight-inch brick sewer in a tunnel from that point north to Henderson street, thence east along that street to Forty-sixth avenue south. The bottom of the concrete sewer, at its greatest depth, was to be about fifty feet below the surface. Empire way extends southward from Henderson street on a down grade through a depression between two hills known as Dunlap canyon. There had been no test drilling or other exploratory excavation in this area, and subterranean conditions were unknown to both the contracting parties.

The appellants started excavation through a shaft,

which they sank to the tunnel level on Henderson street, about a hundred and twenty-five feet east of Empire way. Working both ways from this shaft, they finished the forty-eight-inch sewer without difficulty. They then drove the tunnel south on Empire way to the vicinity of Beacon street, which was slightly less than half way from Henderson street to the south end of the tunnel section. There, they encountered ground so wet and soft that they could proceed no farther. The same ground conditions frustrated their repeated attempts to work through shafts on Empire way, and prevented them from making any substantial progress at the south end of the tunnel section.

In June, 1936, the appellants requested a change order that would permit them to construct the south five hundred feet of the sewer in an open cut instead of a tunnel. The respondent granted the request, but no agreement was reached as to the details, and the plan was abandoned. The appellants then installed an air lock at the south portal, and excavated the remainder of the tunnel section, 1,174 feet of the total distance of 3,798 feet, by the use of compressed air. It is not disputed that the method adopted was necessary under the circumstances, and that it greatly increased the appellants' costs.

The appellants claim that they are entitled to recover this added expense as an outlay beyond the calls of the contract. They contend that both parties contemplated the tunnel section would be a normal, "free air" job; that certain provisions of the respondent's plans and specifications embodied in the contract constituted an implied warranty that it would not be necessary to resort to the compressed air method in excavating the tunnel; and that the plans and specifications were insufficient and defective because it was

physically impossible to do the work in accordance with the methods which they prescribed.

The basic principle of law on which their contentions rest is concisely stated in the following excerpt from an extensive annotation in 76 A. L. R. 268, 269:

"The general rule may be deduced from the decisions that where plans or specifications lead a public contractor reasonably to believe that conditions indicated therein exist, and may be relied upon in making his bid, he will be entitled to compensation for extra work or expense made necessary by conditions being other than as so represented."

The principle has been applied in numerous cases. Two typical and leading ones are *Hollerbach v. United States*, 233 U. S. 165, 58 L. Ed. 898, 34 S. Ct. 553, and *United States v. Atlantic Dredging Co.*, 253 U. S. 1, 64 L. Ed. 735, 40 S. Ct. 423. The *Hollerbach* case involved specifications which definitely stated that the dam, which was to be repaired, was backed by broken stone, sawdust, and sediment. The backing, in fact, consisted of cribbing of sound logs filled with stones concealed beneath an upper layer of soft sediment. It was held that the contractors were entitled to recover for the additional cost of excavating this material, notwithstanding a clause of the specifications directing prospective bidders to inspect the locality of the work and to make their own estimates of the difficulties to be encountered.

In the *Atlantic Dredging Co.* case, it was likewise held that a contractor should have extra compensation to cover expenses incurred in reliance upon misleading representations in a government contract. There, the specifications stated that " 'the material to be removed is believed to be mud, or mud with an admixture of fine sand.' " Bidders were admonished to " 'examine the work, however, and decide for themselves as to its character . . . as the United States does not guar-

antee the accuracy of this description.'" Bidders were also invited to inspect maps prepared by government officers showing the result of test borings in the area to be dredged. These maps did not disclose that, when the tests were made, in some instances the probe had struck impenetrable material. Furthermore, in accordance with a provision of the contract, the dredging equipment to be used by the contractor was examined and approved by a representative of the government. Hard and difficult materials were encountered, which could not be dredged with the contractor's equipment, although it would have been suitable for dredging mud and sand. The court held that the contractor was justified in acting upon the government's representations, even though they were expressed as a belief and were qualified as stated.

The provisions of the specifications in the case at bar, which the appellants claim constituted a warranty or representation that underground conditions were suitable for free air tunneling, are as follows:

"(9.3) *Tunneling:* . . . The contractor's operations shall be conducted in such a manner as not to work the ground forming the floor of the tunnel into mud. Water which seeps or drains into the tunnel excavation must be diverted to subdrains. The water which accumulates in the subdrain sumps shall be disposed of by any method the contractor may devise, subject to the approval of the City Engineer. . . .

"(9.4) *Monolithic Concrete:* If the contract is awarded on the basis of monolithic concrete sewer in tunnel section, the timbering shall consist of segmented blocks or other safe type which will set tightly against the walls of the tunnel and also constitute the outside forms for placing the concrete. . . .

"(9.6) *Subdrains:* Subdrains of 6-inch sewer pipe shall be in accordance with the Standard Specifications, paragraph 127. The subdrains shall be completely blocked with concrete at each connection with the sewer."

Paragraph 127 of the standard specifications provides:

"In wet ground a subdrain shall be constructed when so directed by the City Engineer, of sewer pipe of the size indicated, laid with open joints and surrounded with gravel. At proper intervals, the subdrain may be connected to the sewer if suitable provision is made to prevent sand and other material from running out and undermining the adjacent masonry."

The appellants and two expert witnesses, an engineer and a compressed air tunnel foreman, testified regarding the foregoing specifications, in substance, as follows:

Segmented block timbering is suitable only in fairly firm ground, because, when it is used, excavation necessarily must precede installation of the timbering. In loose or muddy earth, some heavier type of timbering must be employed, such as the square set, in which the timbering, or, rather, its forward thrust, precedes the excavation. Consequently, the specification of segmented blocks in the contract indicated that, in the excavation of the tunnel, wet, soft ground would not be encountered.

The primary function of compressed air in tunnel construction is to hold back the water and thus lend stability to mud or saturated sand that would otherwise flow into the excavation. Since compressed air keeps the water out, there is no occasion to resort to subdrains when it is used. Furthermore, subdrains of six-inch sewer pipe, with open joints and surrounded with gravel, could not possibly be used with compressed air, as the air would flow out through the pipe, and the pressure would be lost. Therefore, appellants and their expert witnesses concluded, the specifications in question gave assurance that the tunnel work would all be done under free air.

The respondent called a number of expert witnesses

who expressed contrary views. One of the city's engineers, two private engineers, a construction superintendent, and two contractors who had unsuccessfully bid against the appellants, each testified that, in his opinion, there was nothing in the plans and specifications which indicated subterranean conditions or represented or impliedly warranted that no tunnel work would have to be done under compressed air. Two of them stated that the provisions relative to subdrains were not necessarily incompatible with compressed air operation. They testified that, when air pressure is used, water commonly comes into the tunnel; that it may be, and customarily is, disposed of by drains; and that a valve placed in that part of the drain pipe which passes through the air lock prevents the air from escaping. Mr. Morse, a hydraulic engineer and Seattle's superintendent of water, testified on that point as follows:

"Q. Now then, I will ask you about water in the tunnel under compressed air. Does the water seep or drain? A. Why certainly there is water in the tunnel beyond the lock, beyond the air lock. Q. You mean towards the face? A. Yes, toward the breast of the tunnel. Q. Where they are excavating? A. Yes. Q. How do they take care of it? A. Why, it's always taken care of with a drain, and it is forced through the air lock and decompression chamber with the force of the air that you are using in the breasting in the heading, the controller by-valve. Q. Then there is a certain amount of wetness in the bottom of the tunnel, or is it higher? A. Well, it's always wet on the bottom, and generally wet all over."

The following testimony of appellants' witness and construction foreman, Mr. Verna, seems to offer some support to Mr. Morse's opinion that the use of compressed air does not necessarily eliminate the water problem in tunnel work:

"Q. In this operation then under compressed air, what more was required to be below the wall boards and in the bottom before you laid the concrete? A. We had to line it with shiplap because the ground was so wet and muddy and slushy. The ground would come up and get mixed with the concrete if we didn't do that."

Mr. Breen, one of respondent's engineers, when called as a witness by the appellants, testified that the subdrains described in the specifications could not be used with compressed air, because the air would be blown out through them. Changing this testimony, he subsequently pointed out that, if the subdrains were connected with the sewer at intervals, as suggested in paragraph 127 of the standard specifications, the air would not escape. The sewer was an integral part of the tunnel which, during construction, was an air-tight tube, sealed by the heading at one end, by the air lock at the other.

The compressed air portion of the tunnel was driven up grade from the south portal. The air lock, which was installed there when construction commenced, was never moved until the tunnel work was finished. Thus, it was feasible to use drains such as those described in the specifications to carry the surplus water to a sump at the lower end of the tunnel. From there, it could readily be disposed of by using the hyper-normal air pressure in the tunnel to force it through a valve-equipped pipe extended beyond the air lock.

The method just described is consistent with the following portion of special specification 9.3:

"The water which accumulates in the subdrain sumps shall be disposed of by any method the contractor may devise, subject to the approval of the City Engineer."

With reference to the timbering specification which appellants emphasize, it will be noted that it is al-

ternatively worded. It directs the use of segmented blocks "*or other safe type* which will set tightly against the walls of the tunnel and also constitute the outside forms for placing the concrete." (sp. spec. 9.4. [Italics ours.])

But even though we assume, as appellants contend, that there is no other "safe type" of the character specified which could be used for normal, free air tunneling through heavy, wet ground, we do not see how the specification could reasonably be taken as a free air warranty, since segmented blocks *can* be used in such ground when compressed air is employed. In fact, the appellants themselves used segmented block timbering in driving the compressed air portion of the Empire way tunnel.

In its oral memorandum opinion, the trial court had this to say regarding the controversy over the meaning of the specifications:

"I am further of the opinion that it is clearly established by the great weight of the evidence that the plans and specifications contained no implied warranty either as to ground conditions to be encountered or that the tunnel could be constructed by the use of free air alone and without the use of compressed air."

The same view was expressed, with some elaboration, in the formal findings of fact. The findings of the trial court based upon conflicting testimony will not be disturbed unless the evidence preponderates against them. *Bohlke v. Wright,* 200 Wash. 374, 93 P. (2d) 321; *Gensman v. West Coast Power Co.,* 3 Wn. (2d) 404, 101 P. (2d) 316; *Tutewiler v. Shannon,* 8 Wn. (2d) 23, 111 P. (2d) 215. We are convinced that the findings of the trial court as to the purport of the specifications should stand.

Since we have concluded that the contract did not contain any representation or implied warranty as

to underground conditions, or that the job was to be done in free air, and that the specifications were not misleading or defective, the principle of law upon which appellants rely clearly is not applicable. Rather, we think, the present case comes within a familiar principle of contract law which is succinctly stated in the italicized portion of the following quotation from Judge Brandeis' opinion in *United States v. Spearin,* 248 U. S. 132, 136, 63 L. Ed. 166, 39 S. Ct. 59:

*"Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered* [citing cases]. Thus one who undertakes to erect a structure upon a particular site, assumes ordinarily the risk of subsidence of the soil [citing cases]. But if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications [citing cases]." (Italics ours.)

The same principle was, in effect, applied by this court in *White v. Mitchell,* 123 Wash. 630, 213 Pac. 10. There, a provision for drainage suggested by the contractors in a contract to build a dwelling, was eliminated by the owners to save expense. During the course of construction, water accumulated in the basement, causing one corner of the concrete foundation to sag, and otherwise damaging the structure. Holding that the owners were entitled to recover damages from the contractors, we said:

"The general rule is that a builder must substantially perform his contract according to its terms, and in the absence of contract governing the matter, he will be excused only by acts of God, impossibility of performance, or acts of the other party to the contract preventing performance. If he wish to protect himself against the hazards of the soil, the weather, labor or other uncertain contingencies, he must do so by his contract."

Appellants emphatically call attention to the fact that the present case involves a unit-price contract. They say that this distinguishes it from cases dealing with "old fashioned lump-sum" contracts which hold that contractors, ordinarily, assume the risk of unforeseen difficulties. There has not been called to our attention any case which specifically makes such a distinction, and we do not consider it sound in principle. A lump-sum contract may have detailed specifications, prepared by the owner, of such a character as to imply a warranty of their adequacy and impose upon him the responsibility for their failure. That seems to have been the situation in *United States v. Spearin, supra.* On the other hand, we see no reason why a contractor may not, by the terms of a unit-price contract, take the responsibility as to construction methods and assume the risk of unknown obstacles.

It is true, as appellants point out, that, here, the unit-price contract contained a great many separate items, but, after all, only one is involved in the phase of the case now under consideration. It called for the construction of a monolithic sewer in a tunnel, at a definite location on Empire way, of specified dimensions and materials, for the price of $27.50 per lineal foot. What possible difference would it make if the contractors had agreed to build the same kind of sewer in the same location and in accordance with the same specifications, except for a lump-sum, instead of a unit, price? The applicability of the principle enunciated in the *Spearin* case, and adopted in *White v. Mitchell,* does not turn altogether upon the circumstance that the contractor is to be paid a fixed sum rather than so much per lineal foot, cubic yard, or other unit of measure. Rather, we think, it depends primarily upon whether or not the contractor, by the terms of his agreement, has definitely created and imposed upon

himself a duty or charge to do a thing possible to be performed.

The appellants lean heavily upon a case which twice came before the second United States circuit court of appeals in recent years, *Montrose Contracting Co. v. Westchester County*, 80 F. (2d) 841, and *Montrose Contracting Co. v. Westchester County*, 94 F. (2d) 580. There, an action was brought by a contractor for the extra cost of compressed air operations in the construction of a sewer in a tunnel. The contractor claimed that the plans and specifications embodied in the contract represented, in effect, that, with the exception of about six hundred feet, the tunnel (approximately eight thousand feet long) was a free air job, which representation was erroneous, because, actually, it was necessary to construct approximately three-fourths of the tunnel by the use of compressed air. The district court decided, as a matter of law, that the contract contained no such representation or warranty, and directed a verdict in favor of the county. The appellate court, however, concluded that there was an implied warranty, and stated that "on this record the jury could find that the contractor had the right to rely on the appellee's [county's] representation contained in the specifications." The case was remanded for a new trial, which resulted in a verdict for the contractor. The judgment entered thereon was affirmed on the second appeal.

Judge Manton, who wrote both opinions, speaking for the court, said in the earlier one:

"Where the ground through which a tunnel is driven contains a moderate amount of water, this can be carried off by means of underdrains. Such underdrains were specified in the contract in detail. They were to be surrounded by broken stone. Such underdrains were entirely unsuited for use in a tunnel being constructed by compressed air methods. Where the ground

is full of water or where the soil is of a type that shifts with the water in it, tunneling is accomplished by keeping an air pressure in the tunnel sufficient to prevent the water from coming in. If the underdrains specified were used, they would allow the air to leak out and would cause a collapse. There was evidence, by men experienced in this kind of work, that a sewer tunnel with an underdrain could not have been built in compressed air. Broken stone surrounding underdrains could not be used in compressed air tunnel work, as the air would escape through the broken stone."

The foregoing statement of factual conclusions, we assume, was based upon the specifications before the court in that case and the testimony as to their meaning and effect. The result of the *Montrose* case, however, did not depend entirely upon the subdrain specifications. The contract also provided for alignment holes to be drilled from the ground surface to the tunnel, which the appellate court, in the first opinion, said "are used in free air tunneling but never in compressed air, since they provide an opening through which pressure would be lost"; and the specifications with reference to ventilation and concreting, it seems, also were not consistent with free air operation. The contract in that case also provided that, where bad ground was encountered, the contractor would be allowed compensation at a higher rate for not to exceed six hundred feet of tunnel. The opinion on the second appeal discloses that this figure of six hundred feet was an arbitrary one which the county's engineers inserted in the contract, although they knew that from three thousand to six thousand feet of the tunnel would require compressed air.

Disregarding its factual conclusions, the *Montrose* case is but another instance of the application of the rule of law enunciated in the *Hollerbach* and the *Atlantic Dredging Co.* cases. As we have already stated, we

consider the rule inapplicable under the circumstances of the case at bar.

It is our conclusion, then, that the appellants are not entitled to compensation for the additional expense which they incurred in constructing the portion of the tunnel section of the project under compressed air.

We come now to the cross-appeal, by which the respondent seeks to overturn the lower court's judgment for the appellants as to each of the following items: (1) Relaying a portion of sixty-inch wood stave pipe damaged by flood, $5,000.77; (2) wood stave pipe and attachments furnished by the contractors, $1,000.65; and (3) dredging not allowed in the final estimate, $197.60.

Counsel on both sides agree that the cross-appeal involves only questions of fact as to all three items. They will be discussed in the order stated.

■ (1) Unit No. 6 of the Henderson street trunk sewer project consisted, in part, of the lowering of an existing sixty-inch wood stave pipe, which was above ground, on Henderson street, from Rainier avenue east to Lake Washington. The appellants were required to dismantle the pipe, reassemble it in a trench excavated to the prescribed grade, and backfill the trench. The contract (sp. spec. 30) stated the order in which this work should be done as follows:

"The lowering of the 60″ Wood Stave Pipe will be the last thing done. The contractor will not be permitted to turn any sewage west from Rainier Avenue and Henderson Street until Unit 2 of the Henderson Street Sewer is ready for sewage."

Obviously, the purpose of the provision was to leave the sixty-inch wood stave sewer pipe intact until the sewage which it carried could be diverted with the use of unit No. 2, then under construction by another contractor.

The appellants were unable to finish the project in their allotted time, and, in December, 1936, respondent's engineer sent them a letter demanding that they proceed at once with the lowering of the wood stave pipe. Unit No. 2 had not been completed, and the sewage was diverted at Rainier avenue to an old ditch, which the appellants cleaned out. It extended to the lake a short distance south of Henderson street. The record does not definitely disclose who first suggested that this ditch be used.

About the first of February, the appellants started relaying the sewer, working westward from the lake shore. By April 12th, about fourteen hundred feet of pipe had been reassembled, but, as to how much of it had been backfilled, the testimony was in conflict. Appellant Coluccio testified that all but "about two hundred feet" at the west end had been completely covered. But, according to the testimony of appellants' foreman, Mr. Verna, "between four or five hundred feet" of the pipe was then exposed. Respondent's witnesses, a foreman and an engineer, estimated, respectively, that four hundred and thirty feet and three hundred and seventy feet had not been backfilled at all. Both of them also testified to the effect that west of Fifty-fourth street, which was about four hundred and seventy feet from the lake, the backfilling was, for the most part, incomplete and little, if any, tamping had been done. The appellants' foreman claimed that he objected to the use of the soft peat material excavated from the trench for backfilling, and that, without avail, he had asked the city engineer to direct the placing of sacks of concrete on top of the reconstructed pipe, as the contract provided he might do.

On the night of April 12th, an inch and a half of rain fell in Seattle, causing the open part of the trench to

fill with water. Some of this water came from the flooding of the ditch to the south, which was serving as a temporary open sewer drain, but some of it also came from the overflow of a pond north of Henderson street. As a result of this condition, eight hundred and forty feet of the reassembled wood stave pipe floated and twisted out of position. The appellants had to relay it, and the additional expense, the trial court found, was $5,000.77.

The earth excavated from the trench contained some peat and was not good backfill material. However, respondent's construction superintendent testified that, when properly used, it was adequate, and the fact that it was successfully used after the floating of the pipe seems to support that conclusion. This same witness and a private engineer called by the respondent expressed the opinion that the floating of the pipe resulted from leaving so much of it exposed. On the other hand, an engineer who was called by the appellants stated that, if proper backfill material had been used and sacks of cement had been placed on top of the pipe, it would have remained in position.

The trial court found that the floating of the pipe was proximately caused by the respondent's action in directing the appellants to proceed with the work out of order during the rainy season of the year, before unit No. 2 had been completed and without making adequate provision for disposal of the diverted sewage and flood water.

The special specifications, with reference to backfilling, 2.4 provided in part:

"All backfilling shall be done in accordance with the Standard Specifications . . . excepting the wood stave pipe will not be backfilled, beyond the dirt removed from the trench."

Paragraph 116 of the standard specifications directed that backfilling follow closely after the laying of the

pipe; that not more than two hundred feet of trench, in which the sewer had been completed, should be left open except by special permission of the city engineer, and that the space between the pipe and the sides of the trench should be thoroughly tamped. The appellants failed to comply with these requirements. Considerably more than two hundred feet of the westerly end of the pipe was wholly exposed on April 12th, and photographs taken on April 13th, and admitted in evidence as exhibits, definitely *show* that the remainder of the trench west of Fifty-fourth avenue was only partially backfilled.

In relaying this pipe, the contractors proceeded westerly from the lake on an ascending grade. The completed backfill, therefore, acted as a dam, which caused the flood water to accumulate in the trench in sufficient volume to float the wooden pipe. Had proper backfilling followed close after the pipe laying, not only would the pipe have had more weight of earth upon it to hold it down, but also the water would have flowed out of the trench through the open westerly end of the pipe.

We think the testimony clearly preponderates against the findings of the trial court as to the cause of the floating of the pipe. Assuming that the city directed the use of the diversion ditch, we could hardly conclude that the method was inherently faulty. The ditch seems to have served its purpose, without serious failure, from the time the Henderson street sewage was turned into it, in January, until the heavy rain storm of April 12th. Even then, it appears that substantial damage would have been avoided had the appellants backfilled in accordance with the minimum requirements of the specifications.

(2) The court allowed the appellants' claim for wood staves furnished by them in the lowering of the

sixty-inch sewer pipe on Henderson street. The record does not definitely show on what part or phase of the work the staves were used. Under special specifications 18.0, the appellants were "responsible for all staves, shoes or bands broken in lowering the pipes." The specification further provided that "All defective staves ordered replaced by the City Engineer shall be paid for [by the city] . . . ." There is no evidence that any defective staves were ordered replaced.

In their reply brief, the appellants assume that the staves were used in relaying the eight hundred and forty feet of the pipe that floated out of position in April, 1937, and it would seem that the trial court, also, reached that conclusion. If we should adopt that assumption, what we have said regarding item No. 1 of the cross-appeal would dispose of this item as well. However, while the testimony on this point is somewhat vague, it inferentially indicates that, for the most part, these staves were used to repair the pipe after it had been crushed, on one occasion, by a slide and, on another, by heavy material, which was dropped upon it from a power shovel during backfilling operations. It does not appear that the respondent was responsible for either of these misadventures. At any rate, the appellants had the burden of proving that the staves were furnished by them under such circumstances as to entitle them to extra compensation therefor. Clearly, we think, they failed to sustain such burden.

(3) The contract called for the dredging of a channel some distance out into Lake Washington, beyond the end of the sixty-inch wood stave sewer on Henderson street. The appellants sublet this work to a dredging company, which was paid on the basis of yardage estimates prepared by the respondent. The subcontractor left a narrow dike of earth to keep the lake water from interfering with the work of lowering the pipe, and this was subsequently removed by the appel-

lants. We are satisfied that they were not paid for this dredging. The testimony is in conflict as to the quantity of earth which they moved, but the record does not warrant disturbing the trial court's findings.

The judgment as to items No. 1 and No. 2 of the cross-appeal is reversed, otherwise it is affirmed. The cause is remanded, with direction to the superior court to modify the judgment accordingly.

BEALS, STEINERT, BLAKE, and JEFFERS, JJ., concur.

