**UNITED STATES of America, for the Use of T. M. PAGE CORPORATION, a corporation, Plaintiff, v. R. R. HENSLER and General Insurance Company of America, a corporation, Defendant.**

No. 15695.

United States District Court
S. D. California, Central Division.

Nov. 19, 1954.

Stephen Monteleone, Walter Atkinson, Los Angeles, Cal., for plaintiff.

Irvin Grant, Los Angeles, Cal., for defendant.

JAMES M. CARTER, District Judge.

This is an action within the jurisdiction of this court, pursuant to the provisions of the Miller Act, 40 U.S.C.A. §§ 270a and 270b, and concerns the claim of a subcontractor against the prime contractor and his insurance carrier in connection with work at the Naval Air station at Mojave.

Because much of the case concerned accounting as to yardage of earth processed, the matter was referred to a Master, who conducted lengthy hearings and has filed his report and recommendations and findings of fact and conclusions of law. The matter comes before this court on motion to approve the Master's findings and conclusions of law, and objections thereto.

The defendant Hensler had a prime contract with the Department of the Navy, Bureau of Yards and Docks, for the reconstruction of an extension of runways at the Mojave Air Station, for the lump sum of $1,307,000, executed on August 20, 1951. On August 23, 1951, Hensler entered into a written subcontract with the use plaintiff T. M. Page Corporation, hereinafter referred to as the plaintiff, for the performance of certain portions of the work required to be performed under the prime contract, generally consisting of earth work, reconstruction of existing base runways and pavement to form a sub-base and certain clearing activities. The subcontract called for the processing of approximately 226,100 cubic yards of earth for a price of $104,006. This figured 46 cents per cubic yard. The contract also provided, "any change in quantity is to be charged or credited at forty-six cents (.46) per cubic yard, measured in excavation [cut]". This part of the subcontract is ordinarily referred to as a unit price contract. In addition, the subcontract provided for the payment of the sum of $20,400 for "clearing" certain of the area involved.

Certain matters are not in dispute. The Master found, and the parties concede that as *part* of the work performed by plaintiff, 241,715 cubic yards have been processed by the plaintiff, and have been paid for by defendant at 46 cents per yard. In addition, 2,038.1 additional cubic yards have been likewise processed by the plaintiff, and there is no serious contention as to the Master's findings in this respect. At 46 cents per cubic yard, this amounts to $937.53. It is likewise not in dispute and found by the Master that the defendant on one occasion overpaid the plaintiff by $1,000. These two items leave a balance of $67.47 due the defendant and not in dispute herein.

The Master has also found that the plaintiff is entitled to $20,400 for

the clearing. Although there is serious contention by the defendant as to its liability for this item, it is included in the subcontract. The record shows the work was done and the set-off credit claimed by the defendant was for sums assertedly due under a separate equipment rental agreement. The Master has found that the equipment was never furnished to the plaintiff or used by him, and that it was never in the contemplation of the parties that the equipment was to be so furnished or used. The Master's findings are clearly correct, and this portion of his findings are approved.

The real controversy in the case concerns additional earth processed, and hinges around the events *prior to* and *after* a change-order made in the prime contract between the Navy department, the principal, and Hensler, the prime contractor, defendant herein. Both parties conceded in the hearing before this court, and the Master found, that in the course of attempting to comply with the contract and subcontract in compacting the soil at the designed subgrade, to 95% maximum density, an *unexpected and unanticipated soil condition* was encountered, which made compaction impossible in the manner provided for by the prime contract, and the plans and specifications carried over by reference into the subcontract. It was also conceded that the Navy department agreed that such an unexpected and unanticipated situation existed and that it was not covered by the prime contract.

The Navy department was notified and negotiations ensued. Shortly prior to March 28, 1952, the change order was negotiated, although it was not issued and was not effective until May 20, 1952. It was referred to as Change Order D, and consisted of twenty-one separate items running from (A) to (U) inclusive, only one of which, item (L) possibly concerned the subcontract or the plaintiff subcontractor. Item (L) in the change order added $76,000 to the figure of the prime contract and in the change order reads, "remove any unsatisfactory ma-terial and replace with pit-run material—38,000 cubic yards at $76,000."

### Excavations Below Subgrade Line *Prior* to Change Order.

Prior to the negotiation of this change order in March of 1952 (executed on May 20, 1952), plaintiff had processed considerable earth in connection with the unsuitable and unexpected materials that were encountered. The Master found 61,625 cubic yards were so processed and both parties at the proceedings before this court conceded this was a correct determination. Plaintiff's first amended complaint as further amended, alleges that 53,895 cubic yards were processed. However, there are other blanket allegations of processing of additional yardage without segregating them to ordinary performance of the subcontract, or to the performance of work on the so-called unsuitable material, that brings the yardage claimed by the plaintiff to well above any amounts found by the Master and conceded by the parties.

In obtaining the required compaction in the areas where the unsuitable material was encountered, it was necessary for the subcontractor to excavate and fill 12 to 16 inches *below* the designed subgrade of the contracts and to mix, manipulate and water the material as it was replaced in 3-inch to 4-inch layers. Section 3–09(b) of the specifications provided in part, "excavation shall be carried on to such depth that sufficient material will be left above the designated grade to allow for compaction to the required grade. Any soft and unsuitable material and other portions of the subgrade or finished grade that will not compact readily shall be removed as directed."

In view of the unsuitable material discovered, which subsequently was indicated by Navy laboratory tests to be some unidentified, floury material, it was not possible to compact the material in place. The problem was encountered shortly after work was commenced on the contract in August of 1951. The

problem was discussed on many occasions between plaintiff, defendant and Navy representatives on the job. Heavy equipment was brought in and tried out. Finally it was found that the only successful method was to excavate *below the subgrade* line in many areas to the full depth of the required compaction of 12 inches. It was only by removing the material to this depth, mixing it elsewhere with other material and replacing the mixed materials in 3-inch and 4-inch layers, that the required density of compaction was obtained. Even by these methods compaction had failed in some areas.

The matter was officially brought to the attention of the Navy by the defendant in a letter dated November 27, 1951, asking for a change order. On February 21, 1952, defendant again claimed the right to a change order, relying on Article 4B of the prime contract, which read in part, "provided that in the case of subsurface latent or unknown conditions this contract may be modified."

On March 7, 1952, the Navy officially answered the two letters just referred to, and confirmed verbal advice of January 21, 1952, that the defendant would receive additional compensation for all unsuitable material encountered to a depth of 16 inches below the top of the subgrade line.

During January, February and March plaintiff and defendant participated in numerous conferences with Navy representatives. These conferences progressed to the point where the Navy representatives acknowledged that the reasonable value of the work already done by the plaintiff subcontractor in the removal of the unsuitable material and the mixing, replacement and compaction of it, was $1.15 per cubic yard for removal and $1.15 per cubic yard for replacement and compaction; and a compromise figure of 18,110 cubic yards for the work already done was tentatively orally agreed upon.

Thereafter plaintiff was apparently dropped from further negotiations which were thereafter conducted by the defendant and the Navy representatives. Eventually the change order D, listing the twenty-one items was issued, including the one item heretofore referred to for the removal of 38,000 cubic yards of unsuitable material for the sum of $76,000. This change order D has been aptly called a "package-deal," in that all twenty-one of the items concerned the defendant Hensler, but only item (L) in any way possibly concerned the plaintiff subcontractor.

In connection with the change order, a letter dated April 23, 1952 from the public Works Office of the Eleventh Naval District, addressed to Hensler, is significant. This letter was written after the negotiations had finally been completed between Hensler and the Navy department, and preceded by almost a month the actual issuance of the change order. The letter identifies the contract, and reads:

"This letter shall constitute your notice to proceed with the following changes under the subject contract:

"a. Remove all not readily compactible material in the new runway extension and existing runway and taxiway areas to a minimum depth of one foot and haul to waste within 1,000 feet, including the removal of the material from the area noted above, below the one foot depth to a maximum of 4″ additional depth where uncompactible material is encountered.

"b. Furnish and place pit-run material in the excavated areas noted above; pit-run material to be compacted in accordance with the contract requirements.

"c. Eliminate the fine grading between the 50 CBR (12″ in depth) material to be placed under the original contract, and the 12″ to 16″ of additional pit-run material included in this change. A tolerance of 1″ will be allowed in placing the pit-run material.

"d. The quantity of pit-run material to be furnished and placed has been determined to be approximately 38,000 cubic yards more or less, as directed by the Officer-in-Charge, for a lump sum price of $76,000 all in accordance with applicable contract provisions and all as directed by the Officer-in-Charge of Construction, and subject to action by Board on Changes."

It will be noted that the letter concerns only what later became item (L) of the change order, and speaks entirely of the future. From the letter it would appear that the 38,000 cubic yards was pinned down to pit-run material to be thereafter supplied, and spoke of the work to be done thereafter and not as to the work heretofore performed by the plaintiff subcontractor with the unsuitable material. In addition, in the work performed after the end of March when the change order was negotiated, the pit-run material was thereafter supplied by the defendant. The plaintiff subcontractor removed the material below the subgrade, hauled it to the designated areas and wasted it, and the defendant supplied the pit and hauled in the pit-run materials and did the compacting.

Thus, it was not specified whether the 18,110 cubic yards tentatively agreed upon was part of the 38,000 cubic yards, but the Master believed that it was not, and the court is of the firm opinion that it was not. The letter of April 23, above, clearly indicates that it was not. The change order spoke of the future and not the work on the unsuitable material previously performed. It will be recalled that the parties were in agreement that in the work on suitable material, actually 61,625 cubic yards were processed below the subgrade line prior to March 28, 1952.

On June 6, 1952, defendant submitted to the plaintiff a proposed change order on the subcontract, which contemplated the payment of $2 per yard for 18,110 cubic yards, or a total of $36,220 less certain deductions, leaving a net to plaintiff of $30,642. This proposed change order however, also required plaintiff to excavate *without charge*, the balance of the area containing unsuitable material and haul and waste it in lieu of compacting and fine grading which would be done by the defendant. Plaintiff would not accept the proposed change order.

The subcontract provided in Art. I, that the work shall be done "in accordance with all provisions of the original contract and the specifications and plans referred to therein, all of which are hereby made a part of this agreement * * *". In Art. III it was provided, "that the Subcontractor shall be bound by any changes or alterations made by the Principal in the original contract specifications and plans or in the amount or character of said work or any part thereof to the same extent that the Contractor is bound thereby." Art. X provided, "the Subcontractor agrees to accept the amount determined and agreed upon by the Principal and the Contractor *to be due him* in settlement of any controversy that may arise * * *". [Emphasis supplied.] Art. XIV provided, "the Contractor will pay for extra work performed and materials furnished by the Subcontractor under written authorization by Principal's engineer * * * the actual cost thereof plus a percentage of said cost equaling one-half the percentage received by the Contractor * * *. Any claim of the Subcontractor for extra work and/or material not so authorized, or for damages of any nature whatsoever, shall be deemed waived by him unless written notice thereof is given the Contractor within ten days after the date of its origin."

As to the claim for excavation made below grade line prior to the change order, there was available to the Master and to the court, under the pleadings and proof, four alternatives:

(1) That the plaintiff take nothing for his services in moving, mixing, replacing and compacting the conceded

yardage of 61,625 cubic yards involving unsuitable materials;

(2) That the plaintiff receive 46 cents per cubic yard, the subcontract price on the conceded yardage, a total of $28,347.50;

(3) That the plaintiff recover $41,653 on the alleged oral and executed contract asserted by the plaintiff purportedly modifying the subcontract;

(4) That the plaintiff recover for this work upon quantum meruit. It is conceded that the credit of $30,642 received by the plaintiff would apply to (2), (3) or (4) above.

The Master rejected (1), namely that the plaintiff take nothing. Certainly, the plaintiff was entitled to some recovery for this work. As to (2), the subcontract rate, all parties, the plaintiff, defendant and the Navy representatives agreed that "unsuitable materials" were encountered, that plaintiff had been required to do much more work than contemplated, and that a change order should issue. The Master therefore rejected (2). As to (3), the Master found that the alleged oral contract modifying the subcontract was never entered into.

The Master accepted alternative (4). He found that plaintiff was entitled to a quantum meruit recovery of $41,653 less a credit of $30,642. He computed this on the basis of the 18,110 yards at the rate of $2.30 per cubic yard referred to in the discussions plaintiff and defendant had jointly with the Navy, and at the same time took into account that actually there had been processed 61,625 cubic yards of material. In this work before the change order, the plaintiff not only moved the material out but mixed it with other materials, returned it and compacted it. At the subcontract rate the 61,625 cubic yards would have equalled $28,347.60 for the work specified in the subcontract. Hauling away the earth, mixing in, and returning the mix to the original area, was clearly beyond the terms of the subcontract.

We think the Master was right. He had ample evidence before him of the cost and reasonable value of performing this work.[1] He had before him the entire course of negotiations between plaintiff, defendant and Navy representatives, a tentative agreement reached with the Navy, the change order with its talk of the future and the letter of direction of April 23, likewise speaking of the future. It is largely a question of fact and the court accepts the Master's determination.

In Boomer v. Abbett, 1953, 121 Cal.App.2d 449, at page 459, 263 P.2d 476, 482, in discussing similar contracts to those involved here, the court said, " * * * prime contractor, was legally bound to the subcontractor, among other things, to transmit and urge the subcontractor's claims before the Bureau and the subcontractor was bound to present his claims" to the contractor in like fashion. Dodge v. Harbor Boat Bldg. Co., 1950, 99 Cal.App.2d 782, 222 P.2d 697, held that the manner in which a prime contractor presented and handled with the Navy the subcontractor claim for extra work, estopped the contractor from questioning the value of the subcontractor's extra work in an action against the contractor by the subcontractor. These cases stand for the

---

1. The record shows that the total cost of the job to plaintiff was $284,805.65. If we take,

| | |
|---|---|
| (1) yardage not in dispute, 243,743.1 amounting to | $112,126.43 |
| (2) cleaning item per contract | 20,400.00 |
| (3) yardage after change order, 69,307.7 at 46¢ (discussed hereafter) | 31,881.85 |
| We have a subtotal of | $164,408.28 |
| without considering plaintiff's claim for work on unsuitable material before the change order. | |
| Allowing $41,653 (before deduction) | 41,653.00 |
| Gives a total compensation to plaintiff of | $206,061.28 |

proposition that where a subcontract incorporates the provisions of the prime contract, the contractor represents the subcontractor claim in dealing with the principal. Under our subcontract it was stated that subcontractor was bound by amounts *agreed to be due subcontractor* by agreement between the principal and the contractor. This clearly shows the contractor's agency to present the subcontractor's claims. Had the defendant secured a determination of plaintiff's claim we might well have a different case. Even in the event of an unfavorable determination, the defendant contractor alone had the administrative remedy of an appeal to the Secretary of the Navy.

From the record herein, and as appears more clearly hereafter, defendant, after a tentative oral agreement had been reached with the Navy in conferences participated in by plaintiff and defendant, abandoned plaintiff's claims. Instead he secured a change order that in twenty items concerned only defendant, and in one item, provided he, the defendant, would supply 38,000 cubic yards of pit-run material for replacing the unsuitable materials.

We do not think the defendant may now question plaintiff's right to reasonable compensation for the extra work performed.

Art. III of the subcontract, providing that the subcontractor should be bound in the same manner the contractor was bound by changes made by the principal in the original contract, plans and specifications, or in the amount or character of the work, does not control. The short answer is no change was made when the change order was executed, as to the work on unsuitable material, already performed. In Art. X, dealing with the subject of the settlement of controversies, the subcontractor agreed to accept the amount *determined and agreed upon by the principal and contractor to be due him.* Certainly change order D cannot be construed (even as to item (L), the only item which might concern the plaintiff) to be an agreement by the principal and the contractor, *settling what was due the subcontractor.* The change order, when read with the detailed letter of direction of April 23, 1952, shows that the defendant was to perform the supplying of the pit-run material and the compacting and the additional compensation was for work to be done by plaintiff and defendant without segregation between them.

Art. XIV concerned extra work and expressly provided for extra work authorized by the principal and for compensation based on what was paid by the principal to the contractor. The second sentence of the Article concerned extra work, not so authorized by the principal, and required the subcontractor to give written notice to the contractor within ten days of the origin of the claim, or the claim was waived. We interpret the clause as not preventing recovery of extra work, even when not expressly authorized by the principal.

True, the subcontract, in addition to incorporating the plans and specifications of the prime contract, incorporated the terms of the prime contract itself under the wording of Art. I of the subcontract, but even so, Art. XIV of the subcontract went further and since it specifically refers to extra work not authorized by the principal, it would control.

■ As to the written notice required to be given by the subcontractor, the facts here show clearly it was waived by the conduct of the parties. The defendant had actual notice of plaintiff's claim. He undertook to present it to the Navy. He wrote letters to the Navy setting forth the contentions both he and the subcontractor relied upon. Nor has the defendant made any express defense based on the second sentence of Article XIV of the subcontract. Instead defendant, apparently relying on the first portion of Art. XIV claims that extra work can only be recovered where it has been authorized in writing.

Defendant's cases are not in point. In Yuhasz v. U. S., 7 Cir., 1940, 109 F.2d 467, the action was against the government on a prime contract, which expressly provided for no recovery for extras unless ordered in writing by the contracting officer. U. S. for Use and Benefit of Lichter v. Henke Const. Co., D. C.Mo.1945, 67 F.Supp. 123, concerned a subcontract which incorporated the prime contract with the government, containing a clause that no charge for extra work would be allowed unless ordered in writing by the contract officer. In neither case was there a provision like the second sentence of Art. XIV of the subcontract herein involved. Bowman v. Maryland Casualty Co., 1928, 88 Cal.App. 481, 263 P. 826 and Bavin & Burch Co. v. Bard, 1927, 81 Cal.App. 722, 255 P. 200, were cases involving building contracts, wherein it was expressly provided that charge for extras should be reduced to writing, with no other provisions concerning extra work.

Defendant urges that plaintiff is entitled to no recovery for the work on the unsuitable material, contending that unexpected difficulties encountered do not excuse performance of the contract;[2] that recovery cannot be had for work beyond the established line and grades of the specifications,[3] and that subcontractor assumes the risk of payment for work performed because of unanticipated difficulties.[4]

█ The construction of the contract placed upon the instrument by the parties themselves carries great weight, Long Beach Drug Co. v. United Drug Co., 1939, 13 Cal.2d 158, 88 P.2d 698, 89 P.2d 386; Burns v. Peters, 1936, 5 Cal.2d 619, 55 P.2d 1182; Moore v. Wood, 1945, 26 Cal.2d 621, 160 P.2d 772.

Here both defendant and plaintiff contended at all times that Art. 4(b) of the prime contract provided for a modification of the contract because of "subsurface latent or unknown conditions." Defendant later secured a change order, based in part on this contention. The Navy conceded before and after the change order that the *"latent or unknown condition"* existed and that Art. 4(b) applied.

Without analysing the applicability of the cases cited by defendant, it is apparent they do not control in a factual situation such as is shown by this record. The Master and this court found that the unknown condition existed and that Art. 4(b) applied, and that the plaintiff and defendant had in substance, so agreed.

### Excavation Below Subgrade Line *After* the Change Order.

After March 28, 1952, or the 1st of April further work was done by the plaintiff in excavating *below* the subgrade line. Plaintiff on April 1st, by written letter was "directed" by the defendant to excavate the entire prism remaining in the area where unsuitable material existed, to a minimum of 1 ft. and a maximum of 1 ft. 4 inches, and to move all waste material as contained in a previous letter of March 28. This plaintiff did. In order to waste the material, he was required to construct roads by banking dirt across existing pavements, construct ramps across a ditch, break up and remove several concrete ducts and remove a fence and grade the wasted materials for drainage. After completion he was required to remove the dirt from the roads, reconstruct the ditch, replace the fence and

2. Citing Carlson v. Sheehan, 1910, 157 Cal. 692, 109 P. 29; Furton v. City of Menasha, D.C., 71 F.Supp. 568; Morse v. City of Boston, 260 Mass. 255, 157 N.E. 523; 6 Williston on Contracts (Rev.Ed.) § 1964, pp. 5512–5513; 6 Corbin on Contracts, § 1333, pp. 289–290.

3. Citing Ford v. U. S., 1881, 17 Ct.Cl. 60, 82; Voorhis v. Mayor of New York, 1875,

62 N.Y. 498; Gillespie Land & Irrigation Co. v. Hamilton, 1934, 43 Ariz. 102, 29 P.2d 158; Norton v. University of Maine, 1910, 106 Me. 436, 76 A. 912.

4. Citing Maryland Casualty Co. v. City of Seattle, 1941, 9 Wash.2d 666, 116 P.2d 280; Queen City Const. Co. v. City of Seattle, 1940, 3 Wash.2d 6, 99 P.2d 407.

compact and fine grade the small areas disturbed by cross hauling. The defendant then supplied the pit-run material and compacted it to specifications. Plaintiff contends he performed the additional duties above referred to, in lieu of the compaction which he otherwise under the subcontract would have been required to perform, and that the defendant waived the requirement that plaintiff perform the compaction. Plaintiff therefore claims the subcontract rate of 46 cents per cubic yard for this work.

The defendant contends for an oral agreement between plaintiff and defendant, whereby the plaintiff was to remove the material and to be relieved of the burden of compacting and fine grading the pit material brought in by the defendant, and that in consideration of being relieved of the compacting and fine grading, plaintiff would take nothing for removal of this material. It will be noted that this alleged agreement meant that plaintiff would perform this work after the change order for nothing. In view of the quantities of material involved, which the Master found to amount to 69,307 cubic yards, the alleged agreement seems an absurdity.

As to the work performed, after negotiation of the change order, plaintiff computed the yardage at 74,092.9. Defendant concedes 65,320.3 yards. Independent calculation made by the defendant's engineers showed 69,307.7 and this figure, which is also an approximate split down the middle between the contentions of the parties was accepted by the Master, and the court likewise accepts it.

The Master relied upon the terms of the subcontract providing for 46 cents per cubic yard of excavation and the specifications, Sec. 3–09(b) referred to heretofore, which provided that unsuitable material should be removed as directed, found that the extra work performed in wasting was probably somewhat less than the cost of compaction, but allowed the subcontractor 69,307.7 cubic yards at 46 cents per yard, or $31,881.55.

As to the work performed by the plaintiff, after the change order, or more specifically after April 1, 1952, we likewise think that the Master's determination was correct. Art. III of the subcontract as pointed out above, bound the subcontractor as it bound the contractor, when changes were made by the Navy. Here the change order in "L" said, that 38,000 yards of unsuitable material would be removed and replaced by pit-run material. As explained by the letter of April 23, and the conduct of the parties, defendant was to supply the pit-run material and do the compacting. Fine grading was eliminated. Assuming plaintiff was bound by this change, he was still to excavate, remove, haul away for a distance of 1,000 yards and waste the material. In lieu of the fine grading and compacting of the previous specifications, he was required by defendant to perform the other duties referred to above which the Master found was substantially equal to the cost of grading and compacting. In view of these facts, and Sec. 3.09(b) of the specifications (supra), that unsuitable and soft material that would not compact shall be removed as directed, Art. III does not control here.

■■■ The facts also support the clear conclusion that the defendant waived the requirement of the subcontract that plaintiff do the compacting. Plaintiff was to be paid 46 cents per cubic yard "measured in excavation (cut)." He was obligated to also do the compacting, but defendant took over this work. "Prevention of performance by the promisee is equivalent to performance by the promisor." Unruh v. Smith, 1954, 123 Cal.App.2d 431, 267 P.2d 52, 57; Carlson v. Sheehan, 1910, 157 Cal. 692, 696, 109 P. 29; California Civil Code, §§ 1511, 1512. Since the Master found that the extra work done, beyond the specifications, though somewhat less in value, was substantially the equivalent of the compacting and grad-

ing, there is nothing inequitable in applying the above rule to this case.

■ Next, the change order was for the benefit of the defendant, and under Art. X of the subcontract this could not be a determination of what was due the subcontractor by agreement between the principal and the contractor.

Finally, the defendant contends that it made an offer to the plaintiff in a letter of March 28, 1952. Defendant concedes that the plaintiff did not in writing or orally expressly accept the offer, but his contention is that all the actions of the defendant were thereafter in line with letter of March 28, and that this action by the defendant constitutes an executed agreement modifying the subcontract, Calif.Civil Code, §§ 1584, 1589, and that Page is estopped to deny the alleged agreement of the letter of March 28.

The letter of March 28, 1952, from the defendant to plaintiff, discussed the proposed modification of the principal contract between defendant and the Navy and stated, "Under the proposed modification, it was contemplated that *an additional payment*, not called for by the prime contractor would be made by the Navy *for the work performed by you to March 20, 1952* * * *. The additional payment to be made by the Navy * * * was to be $2.00 per cubic yard for material determined by the Navy to be unsuitable * * *. Contingent upon such a modification being granted by the Navy, payment will be made to you in accordance with the provisions of our subcontract agreement."

"The remaining area * * * was to be removed to a depth as required of 12 inches minimum, 16 inches maximum and wasted within areas designated by the Navy within 1000 feet maximum one way haul. This work is to be done by you in lieu of compacting and fine grading. *No additional compensation was to be paid to you for the excavation below subgrade and wasting of the material*, it being contemplated that *any work* performed by you in this connection *was to be fully compensated by relieving you* of your obligations to compact and fine grade this area, *and by the payment to you of the sum mentioned in the preceding paragraph*."

"The proposed modification * * * was to include an extension of 120 calendar days and such extension, if granted would be extended to your subcontract * * *".

"In order to meet your need for additional working capital * * * I would request that the Navy pay me * * * for materials stockpiled at my pit * * *. If such request were granted, I agree to advance to you * * * up to * * * $10,000 for additional working capital for this job." The letter then recited that Page had agreed to this over the phone.

Plaintiff replied by letter of April 15, insisting on 46 cents per cubic yard; that defendant's arrangement with the Navy "should not become involved with your obligation to us" and insisting on payment under the subcontract.

On April 1, 1952, four days after the letter of March 28, defendant wrote and "directed" plaintiff "to remove and waste per our March 28, 1952 letter * * *." On June 6, 1952, defendant presented a change order purporting to allow plaintiff $36,220 less certain deductions for 18,110 cubic yards at $2 per yard or a net of $30,642 and provided that the unsuitable material in the remaining areas should be moved by plaintiff and wasted in lieu of compacting, and that plaintiff receive no further consideration for such further removing and wasting. This proposed change order, submitted as a proposed agreement, plaintiff rejected.

Defendant urges that by plaintiff's performance the letter of March 28, 1952 became a contract, and further plaintiff is estopped by its conduct to deny the existence of such a contract.

There are several answers to such contentions.

The Master found that plaintiff never assented to the proposal of March 28, 1952, and the correspondence bears out the finding. Whether a contract arose or estoppel existed necessarily presents questions of fact in the first instance. The Master heard the witnesses and on conflicting evidence, found against the defendant.

There is no reality or logic to defendant's contention since the record shows plaintiff processed 61,625 cubic yards before April 1, 1952 and 69,307.7 cubic yards thereafter. For this defendant offered $30,642, which included the conceded extra work before the change order and nothing for the work after the change order.

But there is another and more obvious defect in the argument. If the letter of March 28, 1952 was an offer it was predicated on additional payment to plaintiff "for the work performed by you (plaintiff) * * * to March 20, 1952. * * * The additional payment to be made by the Navy * * * was to be $2.00 per cubic yard *for material determined by the Navy to be unsuitable* * * *." "The payment to you (plaintiff) of the sum mentioned in the preceding paragraph" was to be the consideration for plaintiff's work after March 20, 1952.

No such determination was made by the Navy. The negotiations and the tentative agreement have been referred to above. Thereafter defendant conducted negotiations with the Navy without plaintiff's participation. Change order D, which resulted, has no resemblance to the negotiations about 18,110 cubic yards.

Thus, the entire premise of defendant's argument fails. The consideration to plaintiff mentioned in the letter evaporated into thin air, and the change order that resulted was in no sense the finding contemplated, nor was it an agreement between the Navy and the contractor (defendant) as to what was due the subcontractor (plaintiff) as provided in Art. X of the subcontract.

Nor do we find an estoppel running against plaintiff. The fact he never received the consideration or compensation contemplated makes ineffective any contention that the extension of time and the $10,000 advance, which were granted, should estop defendant from denying the alleged modification of the subcontract. As to performing the work, defendant did this pursuant to a "direction" in the letter of April 1, 1952.

The principle of the Boomer and Dodge cases, supra, are also applicable to the problems of work done after April 1, 1952. In the Dodge case supra, the court said 99 Cal.App.2d at page 791, 222 P.2d 702:

"* * * A fact which we think is decisive * * * is that Harbor Boat accepted National Ship's figures as to the extent and value of National Ship's extra work and incorporated them in its own demands upon the Navy. * * * It undertook and agreed with National Ship to present the latter's claims to the Navy with its own and *was alone responsible for the failure to segregate the claims of the two companies.* * * *" [Emphasis supplied.]

Finally, the remedies available to defendant in connection with the change order must be considered. A government agency may not arbitrarily issue a change order and treat it as if it were a compromise. Art. 10 of the prime contract provides that the contracting officer "may at any time or times by written order and without notice to the sureties, make changes in the drawings or specifications of this contract. if such changes cause an increase or decrease in the cost of doing the work under this contract * * * an equitable adjustment in the pertinent contract terms shall be made as hereinafter provided * * * any claim of the Contractor for such an adjustment must be made in writing * * * within ten days from the receipt of such change order

* * * equitable adjustment shall be made in accordance with the mutual agreement of the parties provided however, that if the parties are unable to agree, the contracting officer shall determine such equitable adjustment if any * * * and his determination shall be final subject only to appeal under the terms of Art. 16." Art. 16 in turn provides for decision on disputes by the contracting officer and for appeal addressed to the secretary. Pending decision of the dispute, the contractor shall proceed diligently with the performance.

It appears to the court that the defendant did not take advantage of any of these remedies, which he and not the plaintiff possessed, but instead accepted the change order and hastened to secure settlement of his contract by executing a release on September 24, 1954, and receiving the balance of the monies due him. If he is now required to pay more than he anticipated on the subcontractor's claim, the fault is his.

### Conclusion

1. The objections to the Master's findings of fact and conclusions of law, and to his report, insofar as it is included by reference in his findings of fact and conclusions of law, are overruled, except as indicated below.

2. Insofar as the findings of fact and conclusions of law of the Master are modified or added to by findings of fact and conclusions of law in this opinion, this opinion shall modify and supplement the Master's findings of fact and conclusions of law and shall control.[5]

3. The allowance of interest as found by the Master is approved.

4. Each party will bear its own costs, and the costs of the proceeding before the Master shall be equally divided between the parties. Dyker Bldg. Co. v. U. S., 86 U.S.App.D.C. 297, 182 F.2d 85, 89.

5. The court shall accept the Master's findings of fact unless they are clearly erroneous. Rule 53(e) (2), Rules of Civil Procedure, 28 U.S.C.A. The court is not bound by the Master's conclusions of law. Lupton v. Chase Nat. Bank of New York, D.C.Neb. 1950, 89 F.Supp. 393.