[No. 22968.   Department One.   May 8, 1931.]

JOHN JORDAN, *Respondent,* v. CORBIN COALS, LIMITED, *et al., Appellants.*[1]

*Graves, Kizer & Graves,* for appellants.

*Thomas A. E. Lally* and *Williams & Cornelius,* for respondent.

PARKER, J.—The plaintiff, Jordan, commenced this action in the superior court for Spokane county seek-

[1]Reported in 298 Pac. 712.

ing recovery of damages for fraud and deceit on the part of the defendants, Corbin Coals, Ltd., Corbin, its president, and Evans, its general manager, inducing Jordan to enter into a steam shovel mining contract for the removal of a large quantity of surface earth and material and the coal thereunder. A trial on the merits in that court, sitting with a jury, resulted in a verdict and judgment thereon awarding to Jordan recovery, as prayed for, against each and all of the defendants, from which they have appealed to this court.

Corbin Coals, Ltd., is a British Columbia corporation, and, at the times in question and during several years prior thereto, it owned coal mining properties in that province. It then maintained a place of business, apparently its principal place of business, in Spokane, in this state; Corbin, its president, and Evans, its general manager, then residing in this state and conducting its business in Spokane, as had been done during a considerable time prior thereto. Jordan then resided in Spokane. He is a contractor of large experience in steam shovel work, possessing a large outfit of contracting equipment, including a steam shovel for removing earth material; but he had no mining experience.

Coals, Ltd., owned, among other mining properties, its so-called No. 6 mine, which was regarded as suitable to be worked and the coal taken therefrom by steam shovel process; that is, by removing the surface material by steam shovel, and by thereafter removing the coal by steam shovel; this because the coal was covered by only thirty to sixty feet of earth and other apparently loose material.

Corbin and Evans were duly authorized to enter into a contract for the removal of the surface material and the coal thereunder by steam shovel process. In the fall of 1926, negotiations commenced between Cor-

bin and Evans, representing Coals, Ltd., and Jordan, looking to the entering into of a contract to remove a portion of the surface of mine No. 6 and the coal thereunder. The area to be so worked was represented to Jordan by Corbin and Evans as being "virgin country", meaning, as the jury could well believe, that the area was virgin mining ground, both on and under the surface. Following some further negotiations, and the doing of some steam shovel work on another mine for Coals, Ltd., a mile or two distant from its mine No. 6, a contract was entered into between the parties, reading, so far as need be here noticed, as follows:

"Memorandum of Agreement between Corbin Coals Limited, a British Columbia corporation, party of the first part, and John Jordan, party of the second part, hereinafter referred to as Coal Company and Jordan, respectively, WITNESSETH:

"1. The Coal Company employs Jordan to strip the material, other than solid rock, from the body of coal at No. 6 mine at Corbin, British Columbia, 600 feet north to south by 120 feet in width east to west, and to dispose of said material for the sum of 25c per cubic yard. Said material to be disposed of over the edge of the footwall, and at no point to remain higher than the top of the footwall.

"2. If and as solid rock is found in the coals of said stripping the Coal Company will at its expense do all necessary blasting, including the furnishing of tools and explosives to break down said rock. When said rock shall have been broken down, Jordan agrees to remove all the rock that has been so blasted, for 40c per cubic yard, rock to be disposed of by Jordan as provided in paragraph 1.

"3. When said body of coal shall have been stripped, Jordan will at his expense, mine the coal to the extent that it is practicable, break down lumps over two feet in diameter, and deliver same to a chute to be built by the Coal Company near the tunnel of No. 6 mine.

"4. The Coal Company will, at its expense, keep an

inspector on the work as required by the Mining Act of the Province of British Columbia, and it shall be the duty of said inspector to see that the working faces are safe; and he shall also drill such holes as are necessary for the breaking down of coal or impurities, and it shall be his duty to discharge said holes. The said inspector shall have the right to determine what is coal and what are impurities, and Jordan shall place said coal and impurities in cars as the said inspector shall determine and indicate.

"5. When the said coal is stripped, Jordan shall proceed as aforesaid to mine said coal and to deliver in said chutes, 6000 tons, more or less, per week, including holidays and breakdowns; provided that neither party shall be liable for failure to deliver or accept said coal in said amounts if prevented by strikes, or causes beyond the control of either party. Should Jordan, for causes as referred to above, consider it impracticable to continue operations in accordance with this agreement, the Coal Company shall have the right to take over Jordan's equipment at a fair rental and continue the operation at its own expense.

"6. Jordan shall start work under this contract on or before May 1st, 1927, or as soon thereafter as weather conditions will permit.

"7. Jordan shall receive for mining, loading and delivering the said coal and impurities to said chute, 25c per ton, weight to be determined by check weights to be made each week.

. . . . . . . . . . . .

"12. The purpose of this contract is to remove certain overburden and to mine and deliver coal at a specified point; this work to be carried on according to plans approved by the management of the Coal Company, and this contract to be effective for the season of 1927 and until such time thereafter as Jordan shall have removed 300,000 tons of coal."

Soon thereafter, Jordan, at large expense, prepared for the commencement of the work, in constructing railway tracks to and upon the area, and in bringing his steam shovel and other equipment to the area. On

September 27, 1927, while the work of the removing of the surface material was in progress, Jordan was notified by the mine manager of Coals, Ltd., that his steam shovel was then in the vicinity of underground workings; the manager then causing to be placed red flags at several points in the neighborhood of the shovel to designate places where the underground workings came up comparatively near the surface, making it dangerous to work over or near those places, especially with a steam shovel. This was the first notice that Jordan had that any portion of the ground under the surface of the contracted area had ever been worked by tunneling or otherwise.

He then learned that under the contracted area the coal had been removed in large quantities by tunnels, cross-cuts, shafts, and upraises, to the extent that the ground, for the most part, within the contracted area under the surface, was largely honeycombed by such workings; at least to the extent that it was extremely dangerous to proceed with the removal of the surface material by steam shovel process, and also to proceed with the removal of the coal by steam shovel process; which process was clearly contemplated as being that to be used in the carrying out of the contract work by Jordan, and which process would be very much less expensive to Jordan than any other possible method which could be used in removing the surface material and the coal. These dangerous conditions then appearing, Jordan abandoned the work, so notifying Corbin and Evans, they representing Coals, Ltd.; and thereafter commenced this action, seeking damages as for fraud and deceit inducing him to enter into the contract.

Jordan's claim of recovery is rested upon the theory that Corbin and Evans represented to him that the ground was free from all impediments or dangers save

such as appeared on the surface of the ground; and that, while they did not, in words, tell him there were no existing underground workings, they remained silent with reference thereto, and failed to inform him of the existence of such workings, knowing of their existence and knowing that Jordan did not know of their existence. Some other representations are claimed in behalf of Jordan to have been falsely made to him, inducing him to enter into the contract; but these we find it unnecessary to notice.

The principal contention here made in behalf of appellants, and the only one which seems to us to call for serious consideration, is that the trial court erred in refusing to take the case from the jury and decide as a matter of law that the evidence fails to support recovery against appellants; appropriate, timely motions having been made asking such ruling. The argument is largely that the mere silence of appellants as to the existing underground workings does not render them liable to Jordan as for fraud and deceit.

In view of the nature of the undertaking, as contemplated by the contract, and the manifest danger of working over or near the existing underground workings by the steam shovel process of removing the surface material and thereafter the coal, all other methods of removal of the surface and coal being much more expensive, it seems plain to us that the withholding from Jordan of knowledge of the fact of the existence of the underground workings was as effective to render appellants liable to Jordan as if appellants had falsely affirmatively stated to Jordan that there were no workings under the contracted area.

It is argued that Jordan must have known of the existence of the underground workings when he entered into the contract. This argument has no

foundation other than the fact that, at a distance of several hundred feet north of the northerly edge of the contracted area, Coals, Ltd., had a tunnel entering into its mine No. 6 property and was taking coal therefrom. But we see nothing in this record to charge Jordan with knowledge of the fact that the coal coming from that tunnel had come from any existing workings under the contracted area. Indeed, the evidence warrants the conclusion that Jordan had no reason to suspect that the coal which was then being taken or had been taken from that tunnel was from the contracted area; and had no reason to suspect that the contracted area under the surface was largely honeycombed with tunnels, cross-cuts, shafts, and upraises.

The applicable rule, which we regard as controlling of Jordan's right to damage, we think, is well stated in the text of 12 R. C. L. 312, as follows:

"It is generally held that mere silence does not constitute fraud when it relates to matters equally open to common observation or visible to the eye, or where they are discoverable by the exercise of ordinary diligence, or where the means of information are as accessible to one party as to the other. But where a matter is not equally open to the observation of both parties and is not discoverable by the exercise of ordinary diligence, mere silence on the part of the one having the knowledge may constitute fraud. A reason given for this rule is that, since matters are not what they appear to be and the true state of affairs is not discoverable by diligence, deceit is accomplished by suppression of the truth. It has been held, however, that mere silence in such a case does not constitute fraud as a matter of law, but is evidence of fraud, the effect of which may be strengthened or destroyed by the circumstances attending the transaction."

Our recent decision in *Carpenter Lumber Co. v. Hugill,* 149 Wash. 45, 270 Pac. 94, is in harmony with this text.

510

We conclude that the evidence amply supports the verdict and judgment. No question is here made as to the amount of the recovery of damages awarded to Jordan. We think the case does not call for further discussion.

The judgment is affirmed.

TOLMAN, C. J., MITCHELL, and MAIN, JJ., concur.