IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

GENERAL CONSTRUCTION COMPANY, )
a Delaware corporation, )           No. 32305-6-III
)
Respondent, )
)
v. )
)
PUBLIC UTILITY DISTRICT NO. 2 OF )      OPINION PUBLISHED
GRANT COUNTY, a Washington municipal )      IN PART
corporation, )
)
Petitioner. )
_____ )
PUBLIC UTILITY DISTRICT NO. 2 OF )
GRANT COUNTY, a Washington municipal )
corporation, )
)
Third-Party Plaintiff, )
)
v. )
)
GENERAL CONSTRUCTION COMPANY, )
a Delaware corporation, TRAVELERS )
CASUALTY & SURETY COMPANY; and )
TRAVELERS CASUALTY & SURETY )
COMPANY BOND NUMBER )
41S103871237BCM, )
)
Third-Party Defendants. )
_____ )
)

No. 32305-6-III
*Gen. Constr. Co. v. PUD No. 2*

GENERAL CONSTRUCTION COMPANY, )
a Delaware corporation, )
)
               Fourth-Party Plaintiff, )
)
     v. )
)
GLOBAL DIVING & SALVAGE, INC., a )
Washington corporation. )
)
               Fourth-Party Defendant. )

KORSMO, J. — We granted discretionary review of this unduly convoluted and overly-lawyered[1] action at the request of the Grant County Superior Court in order to determine if the doctrine of quantum meruit recognized in *Bignold v. King County*, 65 Wn.2d 817, 399 P.2d 611 (1965), still has application after the decision in *Mike M. Johnson Construction v. County of Spokane*, 150 Wn.2d 375, 78 P.3d 161 (2003) upheld contractual notice and waiver provisions in government construction contracts. In the published portion of this case, we conclude that *Bignold* remains viable after *Johnson* for matters not included within the contract and affirm the trial court's rulings on that point.

---

[1] Despite the fact that this case comes to us from rulings on motions seeking partial summary judgment, the Clerk's Papers tally 20,605 pages. Much of the record is duplicative and unnecessary. Our commissioner's office also has been subjected to repeated motions before discretionary review was sought as well as after review was granted. While it is debatable whether Public Utility District (PUD) is a substantially prevailing party, it is undebatable that both sides have contributed to the excessive litigation. Accordingly, we exercise our discretion under RAP 14.2 and deny costs and fees on appeal.

2

In the unpublished portion we affirm the majority of the trial court's remaining summary judgment rulings, reverse some, and remand this interlocutory appeal for trial.

## FACTS[2]

This case arises from a contract to build a fish ladder into the Wanapum Dam on the Columbia River immediately south of Vantage, Washington. The dam was built between 1959 and 1963, and required the abandonment of the former Vantage town site and its relocation above the new high water levels. The dam was constructed for Public Utility District no. 2 of Grant County (PUD).

The dam was built with 16 intake units designed to house large, power-generating turbines. Six of those units were left open for future expansion of the dam's power-generating capacity. The dam was designed as a "gravity dam" that is built to withstand upstream water pressure by its own weight. Thirteen anchor tendons help support each of the expansion units of the dam since those units do not have sufficient weight to withstand the water pressure. The anchor tendons consist of steel cables anchored into the upstream bedrock.

In the early 2000s, PUD decided to construct a fish bypass in Unit 11, an expansion unit containing three separate slots. It then contracted with an independent

---

[2] Most of the facts necessary to the resolution of the remaining issues will be detailed in the unpublished portion of this opinion in conjunction with the discussion of those issues.

3

firm, Jacobs Engineering, to do some preliminary analysis in anticipation of soliciting bids for the project. Jacobs Engineering produced a series of reports analyzing general, presumptive methods of construction. Based on those reports, PUD produced and disseminated bid specifications. General Construction Company (GCC) and other potential bidders met with Jacobs Engineering to go over that material in preparation for bidding.

Ultimately, PUD awarded the contract to GCC to perform "all work necessary for the Construction of Wanapum Future Unit Fish Bypass." Clerk's Papers (CP) at 19583. The nearly-430 page contract contains many provisions relevant to this litigation. Among the most pertinent to this opinion are provisions that (1) made the overall project engineer the primary contact person between GCC and PUD, (2) allowed the engineer to approve or direct minor changes to the construction process, (3) required PUD management approval for changes costing more than $10,000, (4) required all change requests from GCC be in writing if payment was expected for the change, (5) and stated that GCC's failure to submit a written request for damages within ten days waived the right to payment for those damages.

Regulations promulgated by the Federal Energy Regulatory Commission (FERC) require periodic inspection of dams by independent consultants to analyze potential and actual deficiencies. 18 CFR § 12.32. Pursuant to this requirement, PUD periodically contracted with independent engineering firms to conduct potential failure modes

4

analysis of the dam (PFMA). As a result of the periodic analyses, PUD and FERC constantly monitored the dam for any signs of failure. The most recent analysis prior to the fish bypass project was conducted in late 2004 by Acres International.

Since at least the mid-1980s, PUD and FERC have been aware that the anchor tendon construction method may result in the anchors becoming weakened by the corrosive effects of water. Consequently, the PFMAs have all assessed this possibility and its repercussions. Because of the severity of the consequences, FERC classified this potential failure mode as a "Category I: Highlighted Potential Failure Modes." However, they have been unable to ascertain the likelihood that any corrosion has in fact occurred.[3] Following completion of the project, GCC obtained these reports from FERC through a Freedom of Information Act request. 5 U.S.C. § 552

Just as no plan of battle survives first contact with the enemy[4], it appears no plan of construction survives first contact with the elements. Accordingly, original plans must be revised to address the changed conditions. That was certainly the situation with the Wanapum Dam fish ladder project. Change was constant; the building process saw

---

[3] Wanapum Dam has been in the news in the last few years because of cracks that occurred after completion of the fish bypass construction project. There is no indication in our record that the cracking problem is related to either the construction project or to the anchoring method.

[4] Attributed to Field Marshall Helmuth von Moltke in his 1871 essay, "On Strategy," reprinted in DANIEL A. HUGHES, MOLTKE ON THE ART OF WAR: SELECTED WRITINGS 45-47 (1993).

numerous changes to the projected course of the construction. For instance, although the PUD had anticipated the three slots in Unit 11 would be worked on sequentially, GCC bid the contract to work on the first two slots simultaneously and commenced work according to that approach.[5] However, when Unit 11 moved during construction, tilting very slightly before stabilizing, the engineer ordered GCC to cease simultaneous work and proceed sequentially, delaying the project and driving up GCC's expenses. Many additional changes, some formally requested by GCC and some not, as well as changes directed by the engineer, occurred. GCC also did not submit timely damage claims on some of the changes. Under a partial settlement reached in 2007 during the construction, PUD paid GCC extra for some changes and denied payment for others.

After the project was completed, GCC initiated this litigation addressing the damage claims that were not resolved by the settlement. Ultimately, the matter was assigned to the Honorable John Knodell. Over the course of several years, the parties argued the motions at issue in this appeal. By well-analyzed and thoughtful rulings, the trial court eventually granted partial summary judgment to PUD on several of GCC's damages claims and denied summary judgment on other claims. Similarly, GCC sought to challenge some of the factual bases for the contract and establish that PUD had waived compliance with the contract's notice provisions; those efforts failed.

---

[5] PUD does not agree that the contract authorized the two slot approach, but we view the facts on this issue in the light most favorable to GCC, the nonmoving party.

6

Nonetheless, the trial court was concerned with the question of how strictly to apply the notice and claim provisions of the contract, with particular concern over whether PUD had to establish prejudice in order to rely on the notice and claim provisions. To that end, the trial court urged this court to grant review in order to resolve that specific legal contention and certified its partial summary judgment rulings for appeal. This court granted both PUD's motion for discretionary review and GCC's cross motion. The matter eventually proceeded to oral argument.

## ANALYSIS

The parties understandably frame their arguments under expansive readings of the case most favorable to their position, with PUD emphasizing *Johnson* and GCC relying on *Bignold*. We think it is quite possible to give effect to both cases.

This court reviews orders on summary judgment de novo, and will perform the same inquiry as the trial court. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). All facts and inferences shall be considered in the light most favorable to the nonmoving party. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). Summary judgment is appropriate where there are no material facts at issue and a party is entitled to judgment as a matter of law. *Lybbert*, 141 Wn.2d at 34.

*Bignold* involved a construction project to build a road in King County. The contractor, Bignold, was required to build the road in segments, using materials cut from one portion of the roadway as embankment for subsequent portions. 65 Wn.2d at 819.

7

As with this case, a government-employed engineer had responsibility for directing the project. *Id.* The primary[6] problem that developed was the discovery that large sections of the excavated material were too wet and contained too many boulders to be used for embankment. As a result, the contractor was ordered by the engineer to remove and dispose of the unsuitable material and find replacement material. *Id.* These changed requirements slowed the project down and imposed increased expenses for both the unexpected disposal and for having to obtain materials from a greater distance at a greater expense.

The county paid for only a portion of the additional work it directed Bignold to undertake. *Id.* Bignold sued under a theory of quantum meruit and prevailed on the claims related to the subsurface conditions. *Id.* at 819-22. The Washington Supreme Court affirmed. In the course of its opinion, the court discussed two issues of particular import to this case. First, after noting that the contract required the contractor to give written notice of changed subsurface conditions to the county, the court upheld a trial court finding that the contractor had given "timely notice of the subsurface conditions on the job site." *Id.* at 821, 822. The county had been alerted to the changed conditions as soon as they were discovered and ordered the contractor to perform changes. *Id.* at 822.

---

[6] Other successful claims in the case involved costs imposed by a stop work order and costs incurred when the engineer required the contractor to work under bad weather conditions. *Bignold*, 65 Wn.2d at 823-26.

"Under such conditions, the county cannot defeat recovery by a contractor even if no written notice was given." *Id.* Second, the court expressly rejected King County's argument that the doctrine of quantum meruit had no place in an action on a contract. *Id.* at 826. Instead, the court expressly found it available to the subsurface condition problems, and that it was "an appropriate basis for recovery when substantial changes occur which are not covered by the contract and were not within the contemplation of the parties, if the effect is to require extra work and materials or to cause substantial loss to the contractor." *Id.*

*Johnson* involved a contract between Spokane County and the Mike M. Johnson Construction Company to construct sewers on two separate projects in the Spokane Valley. 150 Wn.2d at 378. Although the parties expected that Johnson would work on the projects sequentially, the county had the ability to direct which streets to work. *Id.* Both contracts required Johnson "to use mandatory notice, protest, and formal claim procedures for claims of additional compensation, time extensions, and changed conditions." *Id.* at 379. Problems developed when one of the streets needed to be redesigned and buried telephone lines unexpectedly were discovered. *Id.* at 378-79. As a result, the county changed the order of streets that Johnson was to work and directed project changes to the street being redesigned; it paid Johnson for the extra expenses of that component of the project, but not for increased expenses to the entire project. *Id.*

9

More changes followed and Johnson noted its unhappiness with the delay and constant change orders, and also indicated that it was incurring additional costs. *Id.* at 380-81. However, it did not follow the contract provisions for protest and for claiming additional compensation, despite the county's written indication that Johnson needed to comply with the contract's provisions. *Id.* at 381-82. After extensive negotiations failed, Johnson eventually filed suit seeking damages; the county defended on the basis that Johnson had failed to comply with the contract. *Id.* at 384. The trial court ultimately granted summary judgment in favor of the county and Johnson appealed. *Id.* at 384-85. This court reversed, deciding that material questions of fact existed concerning whether the county's "actual notice" excused Johnson from complying with the contract. *Id.* at 385. The Washington Supreme Court granted review and reversed in a 5 to 4 decision.

The majority concluded that there was no "actual notice" exception and that, instead, contract requirements would "be enforced absent either a waiver by the benefiting party or an agreement between the parties to modify the contract." *Id.* at 386-87 (citing cases rejecting claims where contractor had not complied with contractual notice provisions). The court expressly rejected Johnson's argument that *Bignold* had created an actual notice exception. *Id.* at 387 (citing *Bignold*, 65 Wn.2d at 822). It read *Bignold* as reaffirming "the long-established rule requiring contractors to follow contractual notice provisions unless those procedures are waived by the owner." *Id.* at 388. It then discussed the cases relied on by Johnson as examples of waiver. *Id.* The majority found

10

that Johnson did not comply with the notice and claim provisions of the contract and that the county did not waive its reliance on those provisions. *Id.* at 390-92.

By contrast, the dissent authored by Justice Chambers argued that it was unfair to require Johnson to comply with the claims procedure when the county had been fully informed about the problems and observed the work performed. *Id.* at 393. The dissent agreed that more than actual notice was required to waive compliance with a contract provision. *Id.* at 400. The dissent read *Bignold* as creating a rule that the failure to comply with the "claims procedures will not defeat the contractor's right to compensation unless that procedural error causes prejudice to the owner." *Id.* In support of that statement, the dissent cites *Bignold*, 65 Wn.2d 817. *Id.* That page, however, is the title page for the opinion and contains three of the nine headnotes for the case. *See* 65 Wn.2d at 817. Thus, the dissent appears to simply be citing *Bignold* in passing. However, headnote three from that page might also bear on the issue. It states:

> **[3] Same—Construction—Formal Notice Requirement—Actual Notice.**
> The fact that a contractor did not give written notice of changed conditions, as required by the contract, did not prevent his recovery for the cost of extra work required by conditions which had not been anticipated by the contracting parties, where the person for whom the work was being done had become immediately aware of the changed conditions as soon as they developed and had ordered the contractor to perform the extra work involved.

*Id.* at 817-18.

11

Our issue arises against this backdrop due to the trial court's concern whether the position of Justice Chambers might have any traction. For several reasons, we think it has none in this case.

First, this case is factually closer to *Johnson* than to *Bignold* because the contract at issue in *Johnson* expressly imposed duties on the contractor to give written notice and follow a specific written claim procedure, as does the contract here. The notice requirements, if any, in the *Bignold* contract are discussed very little, and whether the contractor complied with them is discussed even less. The only notice provision mentioned in the opinion involved the requirement that the contractor notify the county about changed subsurface conditions. 65 Wn.2d at 821. The trial court's finding that the contractor had given that notice was upheld. *Id.* at 822. If there were any other notice provisions at issue, they simply were not discussed.[7] *Bignold* does not provide implicit factual authority for the proposition that contractual notice provisions were at issue there, let alone any authority that they can be ignored.

Second, the *Bignold* passage on page 822 cited for the proposition that lack of compliance with notice requirements is not a bar to recovery[8] is not a statement of the

---

[7] In the event the headnote states a fact that is not included in the opinion, we simply note that headnotes are not prepared by the court and do not constitute authority. *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S. Ct. 282, 50 L. Ed. 499 (1906).

[8] And which subsequently became headnote 3.

12

facts of that case. Rather, the passage expressly cites to two 1941 federal cases that did state that rule of law. This passage simply should be read as a general statement of law rather than as the governing rule of the case. It would be no more than dicta if viewed as a ruling on the issue of compliance with contractual notice provisions in *Bignold* and likely would be in conflict with *Johnson* if treated as such.

Finally, it should go without saying that a dissenting opinion is not law.[9] While GCC can properly urge that Justice Chambers' opinion be adopted, this court is not the place to make that argument. We are bound by the majority opinion in *Johnson*. *E.g.*, *State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984). The *Johnson* majority speaks squarely to the validity of contractual notice and claim provisions—they are valid unless the party in whose favor the provisions act waives the protection. *Johnson*, 150 Wn.2d at 391-92. There must be unequivocal evidence of an intent to waive. *Id.* at 391. *Bignold's* oblique reference to the topic has no bearing on the issue in light of *Johnson*.

*Bignold*, however, is still good law for its actual holding that quantum meruit has a place in litigation arising from a construction contract. 65 Wn.2d at 826. It applies to "substantial changes" beyond the contemplation of the parties and not covered by the contract that result in extra work or substantial costs to the contractor. *Id.* Thus, in

---

[9] But, for those who do need a citation for that proposition, please see *Cole v. Harveyland, LLC*, 163 Wn. App. 199, 207, 258 P.3d 70 (2011) ("[T]he meaning of a majority opinion is not found in a dissenting opinion.").

*Bignold*, the doctrine applied to the costs incurred when the subsurface conditions, duly reported by the contractor upon discovery, varied significantly from that expected by the parties and led to increased costs for finding new fill and the removal and transportation of the saturated materials. *Id.*

Giving effect to both *Bignold* and *Johnson*, we discern the following rules. First, for work within the scope of the contract, which here was "all work necessary for the Construction of Wanapum Future Unit Fish Bypass," the terms of the contract must be complied with unless there is evidence that PUD waived compliance with the notice and claim requirements. For work outside[10] of the contract, and changed work within the scope of the contract where GCC satisfied the contractual notice and claim provisions, quantum meruit applies and entitles GCC to compensation. In essence, *Bignold* provides a supplemental means of recovery when the contract is not applicable.[11]

The trial judge typically took this approach to the various claims presented. An example involved a contractual requirement that an inspector certified by the National Association of Corrosion Engineers (NACE) oversee the painting of the flow fairing

---

[10] For instance, if PUD had required GCC to repair or replace an anchor tendon, the work would have been outside of the scope of the contract to build the fish passages.

[11] GCC sees *Bignold* as providing an alternative theory of recovery rather than merely a supplemental one. We reject that approach.

modules that were to be inserted in the fish bypass.[12] GCC asked that it be allowed to use an internal quality assurance manager employed by one of its subcontractors. That individual, however, was not NACE certified and PUD declined to waive the certification requirement. GCC then hired an outside inspector who had NACE certification at a cost of $67,000.

It later sought reimbursement from PUD for this expense in this litigation. The trial court dismissed the claim on the grounds that GCC had failed to notify PUD of the claim when it arose. Although GCC contends that PUD modified the contract by requiring a third-party inspector, the record does not support the claim.[13] The contract always required a certified inspector without mandating that the person be an independent employee.

The trial court correctly concluded that the Selway claim was barred by the failure to provide timely notice to the PUD. We affirm the dismissal of that claim.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder

---

[12] The production of the modules was subcontracted to Selway Corporation. The parties identify this issue as "Claim 12" or as "the Selway claim."

[13] GCC also argues here, as it does in all instances where the court determined that a claim was not timely raised under the contract, that PUD had waived the notice and claim requirements. We address, and reject, that argument in the unpublished portion of this opinion.

No. 32305-6-III
*Gen. Constr. Co. v. PUD No. 2*

having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

The remaining claims are reorganized and addressed differently than the parties have asserted them. We first address the cross appeal claims that the contract should be invalidated or modified due to mistake or superior knowledge, before turning to the "Slot Claim" and GCC's contention that PUD waived compliance with the notice and claim provisions. We next address, sometimes summarily, the "Coffer Cell" claim, the "District Instruction" claims, and the remaining "Flow Fairings" claims.

*Cross Appeal*

GCC contends that the FERC documents demonstrate that it is entitled to damages due to either mistake or an alleged intentional withholding of information concerning the stability of the dam. The trial court properly rejected this argument.

GCC primarily relies on "the doctrine of superior knowledge" in support of its argument, although it also argues that either mutual or unilateral mistake entitles it to relief. The trial court found that the facts presented did not support either theory because the information contained in the FERC documents was not material. We agree.

In essence, the doctrine of superior knowledge is a variety of fraud where, prior to entering a contract, one party fails to disclose information peculiarly in its possession or unavailable to the other that materially impacts the other's costs or ability to perform on

16

the contract.[14] *See Jordan v. Corbin Coals*, 162 Wash. 503, 298 P. 712 (1931); *Lincoln v. Keene*, 51 Wn.2d 171, 316 P.2d 899 (1957); *Nelson Const. Co. of Ferndale, Inc. v. Port of Bremerton*, 20 Wn. App. 321, 582 P.2d 511 (1978); *see also Walla Walla Port Dist. v. Palmberg*, 280 F.2d 237 (9th Cir. 1960). The law of mistake allows one party to reform the contract where there has either been a mutual mistake by the parties as to the content of the contract, or one party is mistaken about material facts that the other concealed. *Wash. Mut. Savs. Bank v. Hedreen*, 125 Wn.2d 521, 525-26, 886 P.2d 1121 (1994).

Both of these theories hinge on establishing that GCC was unaware of information existing prior to entering the contract that would have indicated Unit 11 could not withstand the two slot construction method.[15] The sole evidence that GCC relies on to establish this particular fact is the FERC classification of a potential failure of the anchor tendons as a "Category I Potential Failure Mode." However, nothing about that information adversely implicates the stability of the dam. Rather, the FERC reports

---

[14] Some of the authority GCC cites involves claims of breach of implied warranty such as an owner representing to the bidding contractor that certain methods of construction would work despite knowing that they would not. *See, e.g., Md. Cas. Co. v. City of Seattle*, 9 Wn.2d 666, 116 P.2d 280 (1941).

[15] GCC's mutual mistake contentions before the trial court were premised on two alternative theories: (1) that the parties mistakenly believed they were agreeing to the two slot method and (2) that the parties were mistaken about the stability of the dam. The bulk of its argument here addresses facts concerning that first theory, one that the trial court agreed had sufficient factual support to deny summary judgment on that claim. CP at 7802, 17050-52. Only the second theory was dismissed, and, consequently, is the only theory of mistake addressed in this section. *Id.*

address the possible *consequences* of dam failure; it does not provide any evidence that anyone knew whether the dam could withstand the two slot construction method. Rather, the evidence in the record seems to indicate that it is impossible to actually assess the probability that the anchor tendons might fail. The trial court correctly concluded that the FERC documents were not material evidence.[16]

Summary judgment was properly granted on the superior knowledge and mistake claims related to the FERC documents.

*Slot Claim*

The remaining slot claim argument is that the parties agreed to build under the two slot method and had to alter that agreement due to the instability of Unit 11. PUD argues that this claim is barred by failure to follow the notice and claims procedure. GCC argues that the contractual notice provisions are irrelevant to its quantum meruit claim, that PUD waived the provisions through the conduct of its engineer, Dana Jeske, and that it gave notice, including notice written on a chalkboard. The trial court concluded that whether the parties understood that there would be two slot construction, regardless of

---

[16] Materiality aside, it appears that the claims also lack a factual basis since the record is replete with evidence that GCC had access to information indicating that possibility. For instance, Jacobs Engineering had conducted a stability analysis specifically in anticipation of the fish bypass project and the bid documents reference specifications resulting from dam stability studies. There is no dispute that GCC's engineer met with and went over substantial material prepared by Jacobs Engineering. He merely claims not to have seen or requested the stability analysis report; no evidence suggests that the information was withheld from GCC.

18

whether the contract called for it to be two slots, was a factual issue to be decided at trial and might, therefore, be outside the contract's notice provisions. Clerk's Papers (CP) at 7802.

With respect to the notice argument, we decline to address PUD's claim because the trial court did not analyze the notice aspect of this issue and we are loathe to scrutinize a record of this size in an interlocutory appeal in order to resolve a claim the trial court did not resolve. The trial court is free to reconsider this issue in light of our analysis of the relationship between *Bignold* and *Johnson*.

We do have to address two[17] of GCC's cross appeal arguments related to this claim. The factual basis for these contentions is a claim that the PUD's engineer directed that GCC not file claim letters.[18] When engineer Jeske directed GCC to abandon the two slot construction due to stability issues, GCC engineer Ed Kittle allegedly provided notice to PUD by writing it on the project blackboard.

We first consider GCC's claim that the writing on the blackboard constituted written notice of its challenge to the change to a single slot method. The trial court concluded that an unpreserved writing on a chalkboard did not provide written notice to

---

[17] GCC's contention that the contract is irrelevant to its quantum meruit argument is rejected for the reasons stated in the first portion of this opinion.

[18] Our review of the record suggests that the engineer asked GCC to attempt to settle matters informally before submitting claims, but we again view this issue in favor of GCC.

PUD. We agree. Even if it were semantically correct to call this "written," it defies the clear contractual intent that notice be made in a substantial and permanent manner, which could, if necessary, be forwarded to PUD management for approval. Writing on a blackboard which is subsequently erased evinces no intent by GCC to provide that notice. The trial court understandably, and quite properly, dismissed this argument.

While the waiver argument has a better grounding in law and in fact than the chalkboard claim, it fares no better because it runs directly contrary to the contract. This claim is based on contentions that the engineer, Jeske, could waive the notice provisions for PUD. He could not.

The contract restricts which individuals have the authority to modify the contract and what situations can constitute waiver of contractual provisions, as well as explicitly defining the authority of the engineer. As the engineer, Mr. Jeske did not have authority under the contract[19] to modify its provisions. His authority extended to direct changes that would not result in additional costs as well as limited authority to direct changes that

---

[19] GCC contends that Mr. Jeske's actions manifested apparent authority as an agent of PUD. However apparent authority can only be derived by the objective manifestations of the principal. *King v. Riveland*, 125 Wn.2d 500, 507, 886 P.2d 160 (1994). Here, the objective manifestations of the principal are set forth in the contract documents that vest certain, specific authority in Mr. Jeske as an agent; contract modification is not part of the authority granted. GCC also contends that since Mr. Jeske was an employee of PUD rather than a third-party contractor, he had actual authority. This argument ignores the fact that an agent only has authority to the extent objectively manifested by the principal.

20

would cost less than $10,000. He could also require GCC to continue with that changed work pending a decision by PUD on GCC's objection. However, the contract explicitly precluded him from directing work changes that would result in substantially increased costs or from otherwise modifying the contract.

Accordingly, the trial court properly rejected GCC's claim that PUD had waived the protection of the notice requirements. The engineer simply had no authority to modify the contract and GCC knew that fact.

We remand the slot claim argument to the trial court.

*Coffer Cell Claim*

PUD next challenges the denial of its motion for summary judgment on its "Coffer Cell" claim (also referred to by the parties as the "Tailrace Claim"). GCC sought damages for the costs of pumping water from its coffer cell on four occasions where it faced higher water levels than expected because PUD actions delayed work into the high water season. We reverse the trial court and grant summary judgment to PUD.

The coffer cell dams were built to create dry work areas on the downstream side of the dam (the tailrace). The appropriate height of the coffer cells was the subject of significant discussion before and after the parties entered into the contract, with historic monthly water levels provided for at least the previous decade. Those documents showed that the water level varied between 480 and 500 feet above sea level, with an average between 490 and 494 feet. GCC decided to build the coffer cell at 497 feet despite the

21

concerns of PUD engineer Jeske that the height might be insufficient. The historic data suggested that the 497 foot level was seldom exceeded until late March. That, in fact, was the time period when the water level first exceeded the coffer dam.

The contract expressly provided that GCC might encounter "high tailrace levels (tailrace elevation 500.0) during the course of the work." CP at 35-36. It also provided that "no time extensions or extra compensation will be given by the District based on weather conditions. The Contractor shall be responsible for the cost of protecting/sheltering of all work vulnerable to such extreme weather conditions." *Id.* Despite the contract provision, the trial court denied summary judgment on the ground that this claim arguably sounded in quantum meruit. GCC believed that its damages were caused by the PUD delay, not by extreme water conditions, and that the extra costs of re-dewatering should be borne by PUD.

The problem with this contention is that claims in quantum meruit are, by definition, claims for activities or costs *not* contemplated in the contract. The contract clearly assigned GCC the obligation of sheltering the work from tailrace levels up to 500 feet and stated that there would be no extra compensation based on river conditions. GCC determined, against the recommendation of PUD's engineer, that a 497 foot coffer cell dam would be sufficient. The gamble backfired when GCC was confronted with water levels between 497 and 498 feet on four days in the spring and summer of 2007. But for the delay, those damages may not have occurred, but nothing about that fact

22

changed GCC's contractual obligation to shelter the work from high water. Consequently, this was not a quantum meruit claim.

We reverse the trial court's ruling and direct that summary judgment be entered in favor of PUD on this claim.

*District Instruction Claims*

PUD next argues that the trial court erred in not granting summary judgment on 28 district instruction claims that it alleges GCC did not timely contest under the notice and claim provisions of the contract.[20] As the trial court did not analyze this argument, we decline to address it, leaving the matter in the capable hands of the trial court on remand.

The essence of this argument involves a series of changes ordered by engineer Jeske under contractual provisions that allowed him to order GCC, in writing, to proceed differently in its construction methods. The contract assumed the changes were not expected to alter GCC's costs, so compliance with the changes was treated as agreement that no additional costs would be incurred. In those instances where the changes would increase costs, GCC was required to file written objections and await a determination by PUD.

---

[20] PUD concedes, somewhat grudgingly, that District Instruction 188 "arguably" and "partially" complied with the notice requirements. Br. of Appellant at 22. GCC appears to have conceded that some of its claims were not timely raised. *Id.* at 21.

It appears that the trial court had concerns about which claims GCC thought were outside the scope of the contract and denied the motion, in part, pending GCC's clarification. CP at 10001. The denial also appears to have been tied into the concern over the application of the *Bignold* quantum meruit doctrine to these claims. While we do not believe vagueness should be a defense to summary judgment, it does appear that the trial judge did not address the merits of the summary judgment motion. Accordingly, neither should we do so.

We decline to address the order in light of the fact that the trial judge may still address the motion.

*Upstream Stoplog Guiderail Claim*

The trial court denied summary judgment on this claim because questions of fact remain for resolution at trial. Again, we agree.

This claim concerns prefabricated components designed to be attached to the dam. Additional costs were incurred when the dam's surface was determined to not be smooth, as it was depicted on PUD's drawings, but instead bulged—apparently a common condition among middle-aged men and middle-aged dams. Unlike the previous district instruction claims, GCC clearly and properly objected in writing. GCC argues, with appropriate supportive authority, that it was entitled to rely on the drawings. PUD responds, with equally supportive authority, that GCC was required to determine dam surface conditions for itself.

24

We agree with the trial court that the reasonableness of GCC's reliance on PUD's plans is a question of fact for trial. Summary judgment was properly denied.

*Remaining Flow Fairings Claims*

These final claims are related to the initial claim addressed in the published portion of this opinion. They involve the assembly of the flow fairing modules prior to installation and a related claim involving the cost of "shrink wrap" that was obtained for use while installing the modules, but was subsequently destroyed by wind prior to the installation.

The flow fairings consisted of three large steel structures fixed to the upstream side of the dam to guide and smooth water flow to the fish bypass. The modules were manufactured in segments, assembled at the jobsite, and then lowered into place and bolted on to the face of the dam. The trial court denied summary judgment. We, once again, agree with the trial court.

The parties seem to be talking about different issues. PUD contends that its approval of GCC's request to assemble the flow fairings by use of two four-segment components put the onus on GCC to ensure the components fit properly. However, this "fit-up" requirement is distinct from the "pre-fit" requirement argued by GCC. The district instruction merely directed GCC to insure that the components would fit together. GCC's claim is that a different instruction, allegedly given at the last minute during a meeting, required it to pre-fit the two modules together prior to installation and increased

25

its costs. GCC objected and promptly filed the general notice required to maintain claims under the contract. CP at 6352.

Similarly, the shrink wrap issue did not arise from a district instruction. Instead, this was an additional requirement, tentatively inserted into the plans, and then ultimately omitted per the verbal instructions of PUD representatives. As notice was timely given, the claim was preserved. Trial will determine the party responsible for this claim.

The trial court correctly denied summary judgment on these issues.

In summary, we affirm the trial court in part, reverse in part, and remand this interlocutory appeal for further proceedings.

_____
Korsmo, J.

I CONCUR:

_____
Siddoway, J.

No. 32305-6-III

FEARING, C.J. (concurring) — I concur in all of the majority's rulings.
Nevertheless, I disagree with or wish to expand some of the analysis of the majority on
two subject matters.

## *Bignold* and *Mike M. Johnson*

I disagree with the tenor of the majority opinion that *Bignold v. King County*, 65
Wn.2d 817, 399 P.2d 611 (1965) and *Mike M. Johnson, Inc. v. Spokane County*, 150
Wn.2d 375, 78 P.3d 161 (2003) may be reconciled. *Mike M. Johnson v. Spokane County*
silently overrules *Bignold v. King County's* ruling that a contractor may recover for
additional work resulting from changed conditions, if the public owner of the project
knows of the changed conditions, despite the contractor's failure to obey contract
requirements demanding compliance with formal written claim procedures.

The majority correctly notes that the opinion in *Bignold v. King County* fails to
outline many of the relevant contract provisions in the subject public works contract. The
*Bignold* opinion notes that the contract contained a "changed condition" section similar to
that found in other standard construction contracts. 65 Wn.2d at 821. Nevertheless, the
decision does not cite any of the language of the section or detail what the court

considered to be a standard contract. What was standard in 1965 might not be standard in 2005. At any rate, the public works contract in *Bignold* had a provision admonishing the contractor to fully examine the contract site before bidding. Another provision demanded the contractor give notice in writing to the county of any subsurface or latent physical conditions materially different from conditions described in the contract. Finally, a provision required the contractor to invoke some section of the contract if it wished payment for extra material. A provision may have exculpated the owner of the project, King County, from any extra costs incurred by the contract by reason of unforeseen conditions at the site.

The Washington Supreme Court, in *Bignold v. King County*, refused to enforce many of the relevant contractual terms. Although the contractor gave oral notice, the contractor failed to provide any written notice of unanticipated subsurface conditions and withheld any written notice of an expectation of additional payments. The trial court granted additional recovery caused by unanticipated conditions, nonetheless, and the Supreme Court affirmed. The high court held that the contractor may recover for additional costs.

Based on *Bignold v. King County*, this court, in *Mike M. Johnson, Inc. v. Spokane County*, reasonably held that Mike M. Johnson need not have necessarily followed the notice provisions in Spokane County sewer installation contracts. Instead, a question of

2

fact existed as to whether the county waived the claims procedures. The Supreme Court

reversed us.

I find language in *Bignold v. King County* irreconcilable with language in *Mike M.*

*Johnson, Inc. v. Spokane County*. In the former decision, the Supreme Court announced

the controlling principles: Courts generally allow recovery for additional costs when the

condition complained of could not reasonably have been anticipated by either party to the

contract. *Bignold v. King County*, 65 Wn.2d at 821-22. This rule remains true despite

admonitory or exculpatory phrases such as those requiring the contractor to carefully

examine the site. *Bignold v. King County*, 65 Wn.2d 822. If the contractor gives timely

oral notice of an unanticipated condition and/or the owner becomes immediately aware of

the changed conditions as soon as they develop and orders the contractor to perform the

changes and extra work, the owner cannot defeat recovery by the contractor for additional

costs even if the contractor provided no written notice of unforeseen conditions and extra

work. *Bignold v. King County*, 65 Wn.2d at 822. The owner cannot preclude recovery

for extra costs incurred by the contractor and caused by a shutdown of work, if the

owner's engineer gives instructions to shut down despite the engineer giving no written

instruction as required by the construction contract. *Bignold v. King County*, 65 Wn.2d at

822-23. Under the previous circumstances, equitable estoppel bars the owner from

relying on a contract provision that requires any instructions to be in writing. *Bignold v.*

3

*King County*, 65 Wn.2d at 823. Quantum meruit provides an appropriate basis for recovery when substantial changes occur which are not covered by the contract and were not within the contemplation of the parties, if the effect is to require extra work and materials or to cause substantial loss to the contractor. *Bignold v. King County*, 65 Wn.2d at 826. The owner cannot rely on contract notice provisions for claims sounding in quantum meruit. *Bignold v. King County*, 65 Wn.2d at 826. A claim in quantum meruit is outside the coverage of the contract. *Bignold v. King County*, 65 Wn.2d at 826.

These controlling principles in *Bignold v. King County* conflict with the following rules applied in *Mike M. Johnson, Inc. v. Spokane County*: Washington law generally requires contractors to follow contractual notice provisions unless those procedures are waived. *Mike M. Johnson*, 150 Wn.2d at 386. A contractor's claim for extra work will be dismissed when there was no written order for the extra work as required by the contract and no waiver of the requirement. *Mike M. Johnson*, 150 Wn.2d at 387. When the engineer issued no required written order for extra work, the contractor may recover for the extra work only if it shows a waiver by the owner. *Mike M. Johnson*, 150 Wn.2d at 387. A building contract provision requiring a written order for alterations or extras will be enforced. *Mike M. Johnson*, 150 Wn.2d at 387. Despite an owner having actual notice of a contractor's protest or claim, the notice, in and of itself, does not excuse the contractor from complying with mandatory contractual protest and claim procedures.

4

*Mike M. Johnson*, 150 Wn.2d at 377, 387. Even if the contractor gives notice of a claim or even if the owner knows of concerns of delay, if the contractor does not give notice of the amount of the claim or length of delay, as required by the contract, the contractor cannot recover for costs caused by delay. *Mike M. Johnson*, 150 Wn.2d at 389. Even if the contractor submits a letter to the owner indicating a concern over a change order and that it expected additional compensation for its work under the order, if the letter does not supply the information required by the contract to support a protest or a formal claim, the contractor will be denied recovery for extra work required by the change order. *Mike M. Johnson*, 150 Wn.2d at 390. A general notice to the owner that the contractor expects additional compensation does not excuse the contractor from complying with the contractual claim procedures. *Mike M. Johnson*, 150 Wn.2d at 390. A contractor's notice of protest to the owner does not excuse the contractor from complying with mandatory claim procedures. *Mike M. Johnson*, 150 Wn.2d at 391.

In *Mike M. Johnson, Inc. v. Spokane County*, 150 Wn.2d 375 (2003), the contractor of a sewer installation public works contract encountered buried telephone lines, which halted work until the county and the utility company resolved the conflict. The construction contract placed all risks from utilities mislocated on the plans or not shown on the plans on the contractor. The contract also required the contractor to use mandatory notice, protest, and formal claim procedures for claims of additional

5

compensation, time extensions, and changed conditions. The contract read that the contractors' failure to follow the procedures resulted in waiver of any claims for protested work. In a 5 to 4 decision, the Supreme Court dismissed Mike M. Johnson's claim for additional work because of its failure to follow contract procedures, despite other written notice to the county of the additional work caused by the unforeseen utilities.

Two facts found in *Mike M. Johnson, Inc. v. Spokane County* may distinguish it from *Bignold v. King County*. First, Mike M. Johnson's owner admitted knowing of the formal protest procedures, but decided to ignore the procedures because of the time needed to comply. Second, the City of Spokane repeatedly warned Mike M. Johnson of the need to follow the contract provisions with regard to notice of additional claims. The *Mike M. Johnson* court formulated no rules for use in the future based on these peculiar facts.

The majority downplays notice requirements found in the public works contract in *Bignold v. King County*. The majority may emphasize that the contractor, in *Bignold v. King County*, sued in quantum meruit. The *Mike M. Johnson, Inc. v. Spokane County* opinion does not show that the contractor, Mike M. Johnson, sued in quantum meruit. The majority in this appeal may also highlight that the contractor, in *Bignold v. King County*, sought recovery for work outside of the contract. I find the distinction between

6

quantum meruit and other forms of recovery and the distinction between suit for work

covered by the contract and for work not covered by the contract hollow. Recovery

should not be based on magic Latin words employed in the complaint. Distinguishing

between work within the contract terms and outside the contract provisions is sometimes

difficult and nonsensical. Washington courts have never provided working definitions

for "work on the contract" and "work outside the contract."

Distinguishing *Bignold v. King County* and *Mike M. Johnson, Inc. v. Spokane

County* by reason of Bignold suing in quantum meruit and Mike M. Johnson not raising

such a claim is unsatisfactory. In each case, the contractor performed additional work

and incurred increased costs as a result of unforeseen underground conditions. Although

the respective owners directed each contractor to perform work in manners unexpected at

the time of contracting, neither contractor performed work beyond the scope anticipated

in the contract. The finished project remained the same.

*Bignold v. King County*, 65 Wn.2d 817 (1965) stands for the following rules.

Quantum meruit means "as much as deserved." *Bignold v. King County*, 65 Wn.2d at

826 (quoting *Losli v. Foster*, 37 Wn.2d 220, 233, 222 P.2d 824 (1950)). Quantum meruit

provides an appropriate basis for recovery when substantial changes occur which are not

covered by the contract and were not within the contemplation of the parties, if the effect

is to require extra work and materials or to cause substantial loss to the contractor.

7

*Bignold v. King County*, 65 Wn.2d at 826. The owner cannot rely on contract notice provisions for claims sounding in quantum meruit. *Bignold v. King County*, 65 Wn.2d at 826. A claim in quantum meruit is outside the coverage of the contract. *Bignold v. King County*, 65 Wn.2d at 826. *Mike M. Johnson, Inc. v. Spokane County*, 150 Wn.2d 375 (2003) did not expressly overrule these quantum meruit rules.

The remainder of this opinion is not to be published to coincide with the lack of publication of the corresponding portion of the majority opinion.

Cross Appeal of Superior Knowledge Claim

General Construction Company (GCC) seeks recovery for additional costs allegedly resulting from its abandonment of a two slot method of construction. GCC argues that the Public Utility District (PUD) demanded it change to a consecutive slot construction method after movement in the dam. GCC further contends that it lacked knowledge of facts existing prior to entering the contract that would have informed it that Unit 11 could not withstand the two slot construction method. In turn, GCC maintains that the PUD had information of a possible dam failure because of corroding anchor tendons. The PUD knew that Federal Energy Regulatory Commission (FERC) classified a potential failure of the anchor tendons as a category 1 potential failure mode.

Based on these alleged facts, GCC argues that the PUD is liable to it for the extra costs attended to the abandonment of the two slot construction method on the basis that

8

the PUD had superior knowledge that it should have disclosed to GCC. GCC also claims a mistake should lead to reformation of the contract.

I agree with the majority in dismissing GCC's cross appeal. As noted by the majority, the FERC report addresses the possible consequences of a dam failure. The report does not indicate that a two slot method of construction of a fish bypass was not safe. The report does not support the factual contention that the PUD should have known the dam could not withstand the two slot construction method.

I write separately to note other defects in the PUD's claim of mistake and superior knowledge. In opposition to the PUD's motion for summary judgment to dismiss GCC's claim for additional costs resulting from the abandonment of the two slot method of construction, GCC relies on the declarations of Dave Anderson and Scott Hanson. The two declarations fail to raise an issue of fact on the claim.

Scott Hanson was the project sponsor for GCC with regard to the Wanapum Future Unit Fish Bypass project. Hanson testified to the PUD's approval of the two slot construction method. Documents attached to Hanson's declaration confirm the PUD's knowledge and approval of the method.

Scott Hanson testified in his declaration that on January 6, 2006, "GCC was directed to discontinue performance of the work in accordance with the July 31, 2005 schedule and was further directed to resequence and reschedule its work in a fashion

9

requiring slot work to be performed essentially sequentially rather than according to the Two Slot Method GCC had proposed and the PUD had designed and approved." Clerk's Papers (CP) at 1296. The PUD denies that it gave any direction to GCC to abandon the two slot method. In his declaration, Hanson does not indicate who directed GCC to resequence its work or who at GCC received the directive. The declaration does not even expressly state that the direction came from the PUD. Scott Hanson does not declare that he was present when the PUD gave any new instructions to GCC. He does not indicate the basis of his knowledge of the direction. Hanson does not attach any document to his declaration confirming any directive from the PUD.

In his declaration, Scott Hanson claims the PUD had superior knowledge with regard to dam stability. Records show that the PUD knew of possible failure of anchor tendons. Nevertheless, Hanson provides no testimony that, assuming he had personal knowledge of such, any movement in the dam, on January 6, 2006, resulted from failure of anchor tendons.

Dave Anderson is a licensed engineer apparently hired by GCC for purposes of this litigation, to review PUD and FERC records. Anderson notes the wealth of reports that show concern for failure of dam anchor tendons resulting from corrosion. Anderson avers: "Production of the known, but undisclosed stability concerns of FERC, PUD and its consultants to the bidders would have caused GCC and, presumably the other bidders,

10

to consider the accompanying unknown, increased risk of re-sequencing work in [Future Unit Intakes] No. 11." CP at 2700-01. I question whether the thinking process of a construction bidder is a permissible subject of opinion testimony. Nevertheless, Anderson does not state that, in fact, GCC would have no longer bid on the assumption that it would be able to engage in the two slot method if it had the same information that the PUD held. Anderson supplies no testimony that the January 6, 2006, movement resulted from corroding anchor tendons.


I CONCUR:

_Fearing, J._

_____

Fearing, C.J.

11